FORM B104 (08/07)                                                          2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Farina, et al. | **DEFENDANTS**<br>Robeck, et al. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Jay M. Spillane, Spillane Weingarten LLP<br>1100 Glendon Avenue, Suite 1200 Los Angeles, CA 90024<br>Tel: 310-229-9300 Fax: 310-229-9380 | **ATTORNEYS** (If Known)<br>See Attached Service List |

| **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☑ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☑ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
See attached.

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief -- other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 100,000,000.00 |

**Other Relief Sought**
Attorneys fees and costs

FORM B104 (08/07), page 2                                    2007 USBC, Central District of California

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| **NAME OF DEBTOR**<br>EMAK Worldwide, Inc. | | **BANKRUPTCY CASE NO.**<br>2:10-bk-42779 |
| **DISTRICT IN WHICH CASE IS PENDING**<br>Central District | **DIVISIONAL OFFICE**<br>Los Angeles | **NAME OF JUDGE**<br>Hon. Richard M. Neiter |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| **PLAINTIFF** | **DEFENDANT** | **ADVERSARY PROCEEDING NO.** |
| **DISTRICT IN WHICH ADVERSARY IS PENDING** | **DIVISIONAL OFFICE** | **NAME OF JUDGE** |
| **SIGNATURE OF ATTORNEY (OR PLAINTIFF)** | | |
| **DATE**<br>9/24/10 | **PRINT NAME OF ATTORNEY (OR PLAINTIFF)**<br>Jay M. Spillane | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

## SERVICE LIST

| | |
|---|---|
| Thad A. Davis, Esq.<br>Michael Li-Ming Wong, Esq.<br>Sarah Zenewicz, Esq.<br>Ropes & Gray LLP<br>Three Embarcadero Center, 3rd Floor<br>San Francisco, CA 94111-4006 | *Attorneys for Defendants:*<br>*Stephen P. Robeck, James Holbrook,*<br>*Jordan H. Rednor, Howard D. Bland,*<br>*Debra Fine, Daniel O'Connor,*<br>*Alfred Osborne, Jr., and Barrie Berg* |
| Charles W. Cox, Esq.<br>Russell F. Sauer, Esq.<br>Latham & Watkins LLP<br>355 South Grand Avenue<br>Los Angeles CA 90071-1560 | *State Court Attorneys for Nominal*<br>*Defendant: EMAK Worldwide, Inc.* |
| Jeremy W. Stamelman, Esq.<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA  90071-3197 | *Attorneys for Crown EMAK Partners, LLC &*<br>*Peter Ackerman* |
| Office of the United States Trustee<br>725 S. Figueroa Street, Suite 2600<br>Los Angeles, CA 90017 | *United States Trustee* |
| Jeffrey M. Reisner, Esq.<br>Irell & Manella LLP<br>840 Newport Center Drive, Suite 400<br>Newport Beach, CA 92660--6324 | *Bankruptcy Counsel for Debtor:*<br>*EMAK Worldwide, Inc.* |
| David L. Neale, Esq.<br>Levene, Neale, Bender, Yoo & Brill L.L.P.<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, California 90067 | *[Proposed] Counsel for Official Committee of*<br>*Unsecured Creditors* |

PROOF OF SERVICE

1   SPILLANE WEINGARTEN LLP
    Jay M. Spillane (Bar No. 126364)
2   jspillane@spillaneweingarten.com
    1100 Glendon Avenue, Suite 1200
3   Los Angeles, California 90024
    (310) 229-9300
4   (310) 229-9380 (fax)

5

    Attorneys for Plaintiffs Robert J. Farina and
6   Gryphon Promotions, Inc., derivatively on behalf of
    Nominal Defendant EMAK Worldwide, Inc.

7

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             COUNTY OF LOS ANGELES

10

| | |
|---|---|
| 11  ROBERT J. FARINA, an individual and GRYPHON PROMOTIONS, INC., a California corporation, derivatively on behalf of Nominal Defendant EMAK WORLDWIDE, INC., a Delaware corporation, | Case No. BC 422808 |

ROBERT J. FARINA, an individual and
GRYPHON PROMOTIONS, INC., a
California corporation, derivatively on
behalf of Nominal Defendant EMAK
WORLDWIDE, INC., a Delaware
corporation,

          Plaintiff,

   vs.

STEPHEN P. ROBECK, an individual;
JAMES L. HOLBROOK, JR., an
individual; JEFFREY S. DEUTCHMAN,
an individual; JORDAN H. REDNOR, an
individual; HOWARD D. BLAND, an
individual; DEBRA FINE, an individual;
DANIEL W. O'CONNOR, an individual;
ALFRED E. OSBORNE, JR., an
individual; BARRIE P. BERG, an
individual; CROWN EMAK PARTNERS,
LLC, a Delaware corporation; PETER
ACKERMAN, and Does 1-100, inclusive,

         Defendants,

   and

EMAK WORLDWIDE, INC., a Delaware
corporation,

        Nominal Defendant.

Case No. BC 422808

SECOND AMENDED DERIVATIVE
COMPLAINT FOR:

1. **BREACH OF FIDUCIARY DUTY**
   **(Duty of Loyalty);**
2. **BREACH OF FIDUCIARY DUTY**
   **(Duty of Due Care);**
3. **BREACH OF FIDUCIARY DUTY**
   **(Sale of Company);**
4. **BREACH OF FIDUCIARY DUTY**
   **(Duty of Disclosure);**
5. **AIDING AND ABETTING**

1  SPILLANE WEINGARTEN LLP
   Jay M. Spillane (Bar No. 126364)
2  jspillane@spillaneweingarten.com
   1100 Glendon Avenue, Suite 1200
3  Los Angeles, California 90024
   (310) 229-9300
4  (310) 229-9380 (fax)

5  Attorneys for Plaintiffs Robert J. Farina and
6  Gryphon Promotions, Inc., derivatively on behalf of
   Nominal Defendant EMAK Worldwide, Inc.

7

8              UNITED STATES BANKRUPTCY COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10


FILED
SEP 16 2010
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

| | |
|---|---|
| In re | Case No. 2:10-bk-42779-RN |
| EMAK WORLDWIDE, INC., a Delaware corporation, | Adv. No. : |
| Debtor and Debtor-in-Possession. | **NOTICE OF REMOVAL OF ACTION TO UNITED STATES BANKRUPTCY COURT** |
| | [28 U.S.C. § 1452(a), Fed. R. Bankr. P. 9027] |
| | [No Hearing Required] |
| ROBERT J. FARINA, an individual and GRYPHON PROMOTIONS, INC., a California corporation, derivatively on behalf of Nominal Defendant EMAK WORLDWIDE, INC., a Delaware corporation, | |
| Plaintiff, | |
| vs. | |
| STEPHEN P. ROBECK, an individual, et al., | |
| Defendants, | |
| and | |
| EMAK WORLDWIDE, INC., a Delaware corporation, | |
| Nominal Defendant. | |

**TO THE UNITED STATES BANKRUPTCY COURT, THE OFFICE OF THE UNITED STATES TRUSTEE, AND PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), 1 57(b)(2), 1334 and 1452(a), and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Plaintiffs Robert J. Farina ("Farina") and Gryphon Promotions, Inc. ("Gryphon") (collectively "Plaintiffs"), suing in state court derivatively on behalf of Nominal Defendant EMAK Worldwide, Inc. ("EMAK"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), hereby remove to this Court the state court action described below:

1.      On or about July 29, 2010, Farina and Griffin filed their Second Amended Complaint in the Superior Court of the State of California in and for the County of Los Angeles ("State Court"), in an action entitled "Robert F. Farina, et al. v. Stephen P. Robeck, et al.", bearing Case No. BC 422808 (the "State Court Action").   A true and correct copy of the Second Amended Complaint in the State Court Action is attached hereto as Exhibit "A" and incorporated herein by reference.

2.      On August 5, 2010, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court for the Central District of California, Los Angeles Division, bearing Case No. 2:10-bk-42779-RN (the "Bankruptcy Case").

3.      By the State Court Action, Plaintiffs, who sue derivatively on behalf of the Debtor, allege that the Defendants, former or current directors of the Debtor, breached fiduciary duties to the Debtor to act with due care, good faith and loyalty in connection with operation of the Debtor's business, and are liable to the Debtor for such breaches.

4.    The State Court Action is a civil action and is not a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power.

5.    The State Court Action is a civil action over which this Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 as it is closely related to the Bankruptcy Case presently pending before this Court.   The State Court Action now removed to this Court is a core proceeding pursuant to, among other things, 28 U.S.C. §§ 157(b)(2)(A), (C) and (O), because the State Court Action directly relates to and affects property of the Debtor's estate and since the issues to be resolved in the State Court Action are unavoidably intertwined with issues concerning the administration of the Debtor's estate.  The Debtor's state court counsel in the State Court Action, also proposed special litigation counsel for the Debtor in this case, has asserted that this action constitutes property of the estate.

6.    Pursuant to 28 U.S.C § 1452(a), the State Court Action, including all claims, counter-claims and causes of action therein, is an action that may be removed to Bankruptcy Court.

7.    This Notice of Removal is proper and timely under Bankruptcy Rule 9027(a)(2) since this Notice has been filed within 90 days after the order for relief in the Bankruptcy Case.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Bankruptcy Rules 9027(b) and (c), Plaintiffs will promptly file a copy of this Notice of Removal with the Clerk of the State Court and serve the appropriate notice on all parties.  Removal of the State Court Action and all claims and causes of action therein will be effected upon the filing of a copy of this Notice of Removal with the Clerk of the State Court pursuant to Bankruptcy Rule 9027(c).

1    **PLEASE TAKE FURTHER NOTICE** that, unless otherwise ordered

2   by the United States District Court, this matter is automatically referred to the

3   United States Bankruptcy Court for the Central District of California, Los

4   Angeles Division in accordance with Rule 9027(e) of the Federal Rules of

5   Bankruptcy Procedure and 28 U.S.C. § 157(a). The parties to the Action shall

6   proceed no further in the State Court unless otherwise ordered by this Court.

7

8   DATED:  September 15, 2010          SPILLANE WEINGARTEN LLP

9

10                                      By:

11                                          Jay M. Spillane

12                                      Attorneys for Plaintiffs Robert J. Farina
                                        and Gryphon Promotions, Inc.,
13                                      derivatively on behalf of Nominal
                                        Defendant EMAK Worldwide, Inc.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Removal

- 3 -

# EXHIBIT A

COPY

1  SPILLANE WEINGARTEN LLP
2  Jay M. Spillane (Bar No. 126364)
   jspillane@spillaneweingarten.com
3  1100 Glendon Avenue, Suite 1200
   Los Angeles, California 90024
4  (310) 229-9300
   (310) 229-9380 (fax)
5
   Attorneys for Plaintiffs Robert J. Farina and
6  Gryphon Promotions, Inc., derivatively on behalf of
   Nominal Defendant EMAK Worldwide, Inc.
7

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUL 29 2010

John A. Clarke, Executive Officer/Clerk
BY MARY GARCIA, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF LOS ANGELES

By FAX

10
11  ROBERT J. FARINA, an individual and        Case No. BC 422808
    GRYPHON PROMOTIONS, INC., a
12  California corporation, derivatively on     SECOND AMENDED DERIVATIVE
    behalf of Nominal Defendant EMAK           COMPLAINT FOR:
13  WORLDWIDE, INC., a Delaware
    corporation,                               1.  BREACH OF FIDUCIARY DUTY
14                                                  (Duty of Loyalty);
                    Plaintiff,                 2.  BREACH OF FIDUCIARY DUTY
15          vs.                                     (Duty of Due Care);
                                               3.  BREACH OF FIDUCIARY DUTY
16  STEPHEN P. ROBECK, an individual;              (Sale of Company);
    JAMES L. HOLBROOK, JR., an               4.  BREACH OF FIDUCIARY DUTY
17  individual; JEFFREY S. DEUTCHMAN,             (Duty of Disclosure);
    an individual; JORDAN H. REDNOR, an       5.  AIDING AND ABETTING
18  individual; HOWARD D. BLAND, an
    individual; DEBRA FINE, an individual;
19  DANIEL W. O'CONNOR, an individual;
    ALFRED E. OSBORNE, JR., an
20  individual; BARRIE P. BERG, an
    individual; CROWN EMAK PARTNERS,
21  LLC, a Delaware corporation; PETER
    ACKERMAN, and Does 1-100, inclusive,
22
                    Defendants,
23
           and
24
    EMAK WORLDWIDE, INC., a Delaware
25  corporation,

26                  Nominal Defendant.
27
28

Plaintiffs Robert J. Farina ("Farina") and Gryphon Promotions, Inc.
("Gryphon"), derivatively on behalf of Nominal Defendant EMAK Worldwide, Inc.
("EMAK"), allege:

### Nature of Action

1.     This is a shareholder derivative action in which Farina and Gryphon, on
behalf of Nominal Defendant EMAK, seek to obtain a recovery for the benefit of
EMAK, or alternatively directly to the common shareholders, against the Defendants,
current or former officers or directors of EMAK, arising from the Defendants'
numerous breaches of fiduciary duties to EMAK and its common shareholders. Also,
Plaintiffs allege herein that the breaches by the Defendant directors were induced,
aided and abetted by EMAK's preferred shareholder, Crown, and its principal,
Ackerman.

### The Parties

2.     Farina is an individual residing in Los Angeles County, California.
Farina was a shareholder of EMAK during the events complained of herein.

3.     Gryphon is a California corporation with registered offices at 6855
Santa Monica Boulevard, Hollywood, CA 90038. Farina transferred his shares of
EMAK to Gryphon. Farina is the sole or dominant shareholder of Gryphon, and
therefore remains beneficially the owner of these shares. Thus, Farina has been the
owner of EMAK share, directly or beneficially, at the times complained of, and
throughout this litigation.

4.     Nominal Defendant EMAK, for whose benefit this action is brought, is
a Delaware corporation with its headquarters at 6330 San Vicente Boulevard, Los
Angeles, CA 90048. On information and belief, EMAK's directors, officers, key
employees and records are located in California.

5.     On information and belief, Defendant Stephen P. Robeck is an
individual residing in Los Angeles County, California. On information and belief,
Robeck began working at EMAK in 1986, eventually buying a significant share of the

Second Amended Derivative Complaint

- 1 -

company in 1989. On information and belief, Robeck served as Chairman of the Board of Directors of EMAK from 1994 through 1998 and again from February 2005 through December 2009. On information and belief, Robeck served as interim Chief Executive Officer of EMAK from May 2005 through November 2005.

6.     On information and belief, Defendant James L. Holbrook, Jr. is an individual residing in St. Louis, Missouri and working in Los Angeles.   On information and belief, Holbrook joined EMAK in November 2005, and has served on its Board and as its Chief Executive Officer since that time, save for a short period from about February through April 2010.

7.     On information and belief, Defendant Jeffrey S. Deutschman is an individual residing in New York.   On information and belief, Deutschman has served on the EMAK Board from 2000 through the present. On information and belief, Deutschman works for Ackerman's "Crown" companies. On information and belief, at all times Deutschman has been placed on EMAK's Board by Crown pursuant to Crown's rights under the agreements between Crown and EMAK pursuant to which Crown obtained its preferred shares.

8.     On information and belief, Defendant Jordan H. Rednor is an individual residing in New York.   On information and belief, Rednor has served on the EMAK Board from June 2008 through the present.   On information and belief, from about May 2010 to the present Rednor has served as Chairman of the EMAK Board.

9.     On information and belief, Defendant Howard D. Bland is an individual residing in California.   On information and belief, Bland served on the EMAK Board from April 2003 through late 2009.

10.     On information and belief, Defendant Debra Fine is an individual residing in California.   On information and belief, Fine served on the EMAK Board from June 2008 through late 2008.

Second Amended Derivative Complaint

- 2 -

11.     On information and belief, Defendant Daniel W. O'Connor is an individual residing in Massachusetts.   On information and belief, O'Connor served on the EMAK Board from February 2006 through late 2008.

12.     On information and belief, Defendant Alfred E. Osborne, Jr. is an individual residing in Los Angeles.   On information and belief, Osborne served on the EMAK Board from December 2000 through June 2008.

13.     On information and belief, Defendant Barrie P. Berg is an individual residing in New York.   On information and belief, Berg served on the EMAK Board from November 2004 through June 2006.

14.     On information and belief, Defendant Crown EMAK Partners, LLC ("Crown") is a Delaware corporation with registered offices at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

15.     On information and belief, Defendant Peter Ackerman ("Ackerman") is an individual residing in Washington, D.C.  On information and belief, Ackerman is the principal of Crown and other "Crown" entities that he also owns and controls.

16.     Plaintiffs have no knowledge of the true names and capacities of the parties sued as Doe Defendants 1-100, inclusive, and therefore sues them using fictitious names.  Plaintiffs will amend this Complaint to identify these Doe Defendants specifically if and when their true names and capacities are ascertained.

17.     On information and belief, through their acts or omissions, Does 1-100 are responsible, along with the other specifically-named defendants, for the injuries alleged, and therefore are liable to them.  On information and belief, at all times, the specifically-named defendants and Does 1-100 were principals, agents, and/or representatives of each other, or acting in concert with one another, such that the acts or omissions of any of them can be ascribed to the others.

Second Amended Derivative Complaint

- 3 -

1

### EMAK Background

2      18.    According to EMAK's public filings, EMAK "is the parent company of

3  a family of marketing service agencies including Equity Marketing, Logistix,

4  Neighbor and Upshot. Its agencies are experts in 'consumer activation' by offering

5  strategy-based marketing programs that directly impact consumer behavior. The

6  agencies provide strategic planning and research, consumer insight development,

7  entertainment marketing, event marketing, shopper marketing and environmental

8  branding."

9      19.    "Equity Marketing creates social currency for its clients by integrating

10 their brands into popular culture through innovative and breakthrough entertainment-

11 based promotions." "Logistix is a global marketing services and product development

12 company specializing in the consumer and retail segments." "Upshot is a 160-person

13 marketing agency." "Neighbor" is a "marketing collective." www.emak.com.

14     20.    EMAK's Form 10-K for the period ending December 31, 2007, the last

15 Form 10-K filed by EMAK, says that EMAK's business breaks down into marketing

16 agency and promotional products services. According to that form, from the years

17 2005 through 2007 promotional products services accounted for in excess of 75% of

18 EMAK's gross revenues.

19     21.    EMAK began in 1983 as a privately held company called "Marketing

20 Equities" with an office in New York. A December 14, 2009 letter to shareholders

21 from Robeck confirms that the company's success was rooted in the placement of

22 promotional products. Robeck says that EMAK delivered its first promotion with

23 Burger King in 1986, and that Burger King remained a backbone client of EMAK

24 through placement of products such as The Simpsons and Pokémon toys throughout

25 Burger King restaurants. Robeck's letter says that the Burger King promotional

26 products business accounted for as high as 85% of the company's revenues. EMAK's

27 1997 Form 10-K says that from 2005 through 2007 Burger King accounted for some

28 50% of EMAK's revenues.

Second Amended Derivative Complaint

- 4 -

22.     According to Robeck's letter to shareholders, EMAK enjoyed long periods of successful operational and financial performance. On information and belief, in 1991 Robeck and Donald Kurz became 50/50 owners and co-CEO's of what was then still known as Equity Marketing. In 1994 EMAK went public and opened an office in Los Angeles. Robeck said that after the initial public offering "[t]he next couple of years were very good. The business . . . was continuing to grow. At one point our market capitalization was over $100 million and the stock traded (very briefly) above $30 per share."

23.     In 1996, says Robeck, Robeck and Kurz decided that Kurz would become the sole CEO, with all employees reporting to him, and Robeck ascended to more of an oversight role as Board Chairman, consulting with Kurz on broad strategies.

24.     On information and belief, one of the strategies Kurz and Robeck discussed and approved was to diversify EMAK from its nearly exclusive reliance on promotional products and into the marketing agency business. Robeck says that neither he nor Kurz had experience in pure marketing agency activities, and that he and Kurz therefore decided to pursue those activities through mergers and acquisitions. According to Robeck, EMAK made four smaller acquisitions, and then in 1997 hired a new CFO with strong mergers and acquisitions experience. On information and belief, from that point EMAK, with board support, engaged in larger mergers and acquisitions activities.

25.     On information and belief, EMAK continued its strong financial performance until 2004. Robeck's letter to shareholders expresses satisfaction with a huge promotion with Burger King in 2000 involving Pokémon products.

26.     Robeck's letter discloses some tensions beginning in 2004 involving compliance with the corporate governance burdens of running a public company, financial performance and Kurz's suggestions that EMAK enter into a "going private" transaction. In 2004 and in 2005 EMAK recorded significant asset impairment

1  charges stemming from prior acquisitions. Robeck's letter says that he disagreed with

2  what he perceived to be Kurz's focus on corporate stock repurchases and going

3  private transactions and that he wanted Kurz to focus on cutting costs and

4  streamlining operations. This was apparently the source of tensions between Kurz on

5  the one hand and Robeck and other Board members on the other, as more particularly

6  alleged herein.

7  <u>**EMAK's Common Share Prices, and the Preferred Shares**</u>

8       27.    On information and belief, from February 1994, until late 2008,

9  EMAK's common shares traded on NASDAQ. Common share prices had risen into

10  the $20s per share and as high as $30 per share in the 1990s. In the 2000s common

11  share prices had been from $10 to $15 per share. In 2005, leading into the events

12  alleged below, common share prices were around $10 per share.

13       28.    On March 29, 2000 EMAK entered into agreements whereby Crown

14  invested $25.0 million in EMAK in exchange for 25,000 Series A preferred shares in

15  EMAK. Among other rights, Crown's preferred shares permitted Crown to receive a

16  liquidation preference constituting repayment of its investment plus any accrued and

17  unpaid dividends, or conversion of each share of preferred stock into a large block of

18  common shares at a conversion price of $14.75 per share. At that time Crown also

19  enjoyed a 6% annual dividend as well as rights to designate two individuals to serve

20  on EMAK's Board.

21  <u>**The Zelnick Media Offer**</u>

22       29.    In April 2005 the tension at EMAK had emerged, pursuant to which

23  Kurz favored, and Robeck opposed, a transaction in which EMAK's shares would be

24  purchased by a buyer, and would as a result "go private." In such a going private

25  transaction, EMAK would be owned by a purchaser, possibly one aligned with Kurz.

26  Crown's shares would be bought out. Robeck, who by that time lead the dispute with

27  Kurz, would be replaced. Crown would be out and unable to place directors on

28  EMAK's board. The prospect of a going private transaction, particularly one lead by

1   or with the participation of Kurz, therefore portended that all or a major portion of the

2   existing EMAK Board would be sacked, therefore ending their sinecure at EMAK.

3   On information and belief, the EMAK board therefore reacted to Kurz-lead going

4   private transactions defensively, in bad faith, and for the purpose of entrenchment,

5   and not, as their duties required, in a dispassionate and informed manner for the

6   benefit of the common shareholders.

7        30.    On information and belief, Robeck received an April 19, 2005 letter

8   from ZelnickMedia proposing a transaction "by which each of [EMAK's]

9   shareholders would receive cash for their shares." On information and belief,

10   ZelnickMedia was interested in paying a premium price to buy EMAK, up to $15 per

11   share. The April 19, 2005 letter explained that ZelnickMedia was a partnership of

12   experienced media executives with extensive experience in publishing, brand

13   management, marketing and entertainment, and that it managed media companies

14   with revenues approaching one billion dollars. The letter informed EMAK that the

15   executive team included Strauss Zelnick, former CEO of BMG Entertainment and

16   President/COO of Twentieth Century Fox.

17        31.    At the time, EMAK shares were trading in the $10 range. This offer, if

18   followed through and taken, would therefore have resulted in cashing out the Crown

19   preferred shares and a substantial profit to the common shareholders over the share

20   price then reflected on the stock market.

21        32.    On information and belief, the EMAK Board reacted to this offer in bad

22   faith, and with an irrational anti-Kurz passion. On information and belief, Robeck

23   and Deutschman were opposed to the transaction because it was being lead by Kurz,

24   grousing to the Board that Kurz was trying to "get the stock cheap" or "steal the

25   stock."

26        33.    On information and belief, Deutschman acted not only with loyalty to

27   Crown and not to the EMAK common shareholders, but also in his personal financial

28   interest. At $15 per share, Crown would merely be bought out of its investment, and

1   it would receive no further dividends.  Crown wanted to hold its shares until the share

2   price rose and Crown could make a substantial premium at its $14.75 per share option

3   exercise price.   On information and belief, for these reasons Crown inveighed upon

4   Deutschman to oppose the transaction.  Additionally, on information and belief,

5   Deutschman had been promised by Crown a personal bonus if he could help steer

6   EMAK toward a sale of Crown's stock at a premium.  A sale at $15 per share would

7   result in no premium to Crown and no personal bonus to Deutschman.

8          34.     On information and belief, a majority of the remainder of the Board was

9   swayed by, and adopted, the entrenched and disloyal views exhibited by Robeck and

10  Deutschman.  Rather than inform themselves concerning the ZelnickMedia proposal,

11  the Board exercised no informed judgment at all.  The EMAK Board failed to seek or

12  obtain information concerning ZelnickMedia's proposed transaction, including,

13  without limitation, what ZelnickMedia was prepared to offer EMAK's shareholders at

14  that time.  Thus, the Board failed to take even minimally reasonable efforts to inform

15  themselves concerning the ZelnickMedia proposal, such that the Board could have

16  exercised an informed business judgment concerning whether pursuing or passing on

17  the ZelnickMedia proposal would have been in the best interests of EMAK and its

18  shareholders.  On information and belief, the Board exhibited knowing and deliberate

19  indifference to their obligations to inform themselves concerning the offer.

20         35.     Robeck responded to the April 19, 2005 transaction proposal from

21  ZelnickMedia with a May 2, 2005 letter rejecting pursuit of the proposed transaction.

22  Robeck did not explain in his letter how providing information to and receiving

23  information from ZelnickMedia would have hindered any other interests that the

24  Board wanted to pursue.  Robeck closed: "should our views change in the future, we

25  will keep ZMC's inquiry in mind."

26         36.     While Robeck's April 19, 2005 letter to ZelnickMedia reflects a scripted

27  position that the Board supposedly exercised a reasoned business judgment, Robeck's

28  December 14, 2009 letter to shareholders reveals a truer motivation for the Board's

1   inaction -- an anti-Kurz animus, entrenchment and self-interest. Robeck's letter to

2   shareholder refers to the ZelnickMedia proposed transaction as "the now-infamous

3   '15 a share' episode." To the contrary, the ZelnickMedia offer was not an instant of

4   infamy, but an opportunity to benefit the common shareholders, an opportunity that

5   the Board elected in bad faith not to pursue or even study.

6        37.   On information and belief, the ZelnickMedia proposed transaction could

7   have been revived in late 2005 or even 2006 had the EMAK Board followed through

8   on its promise that it would "keep ZMC's inquiry in mind." On information and

9   belief, the Board still had opportunities to respond to the ZelnickMedia offer in and

10  after October 2005, but it continued its policy of refusing to consider the offer in good

11  faith. Unfortunately, however, the Board continued its policy during that period of

12  declining to receive information concerning the proposed transaction.

13       38.   On information and belief, the EMAK Board's failure to even inform

14  themselves concerning the ZelnickMedia proposed transaction reflected the beginning

15  of an era in which the EMAK Board lost sight of its fiduciary obligations to the

16  EMAK common shareholders, but instead adopted an attitude of entrenchment and

17  opposition to any possibility that Kurz could head an EMAK gone private, an EMAK

18  in which the members of the Board would presumably have no further position. On

19  information and belief, from this time forward the EMAK Board valued, and fought

20  to retain, their respective positions as directors of a publicly traded company,

21  positions that resulted in non-employee Board members receiving five and six figure

22  annual remuneration in cash and stock grants.

### The Kurz Resignation

23

24       39.   On May 19, 2005, EMAK filed a Form 8-K with the SEC disclosing

25  that, as of that date, Kurz had resigned as President and CEO of EMAK. The Form 8-

26  K attached and incorporated a press release from EMAK.

27       40.   EMAK's press release said: "Originally a small promotional

28  organization, Mr. Kurz was instrumental in planning and executing EMAK's growth

1   and diversification efforts. Under his leadership the Company greatly expanded its

2   services offerings, geographic presence and client roster by acquiring five marketing

3   agencies around the globe."

4        41.    The press release went on to quote Robeck as saying: "'Don has done a

5   remarkable job since taking over as sole CEO six years ago. He has transformed the

6   Company from a small, one-service, one-client organization into the global marketing

7   services player it is today.'" "'On behalf of the Board, I want to thank Don for his

8   vision, his service and his friendship. I look forward to working closely with Don and

9   the rest of the Board in the months and years ahead.'"

10       42.    The May 19, 2005 Form 8-K filing was certified on behalf of EMAK by

11  Teresa L. Tormey, its Executive Vice President, General Counsel and Secretary.

12       43.    On information and belief, Kurz voluntarily resigned from the EMAK

13  Board in August 2005.

14                   **The November 2005 Due Diligence Request**

15       44.    On information and belief, after resigning from the EMAK Board, Kurz

16  lined up commitments from private equity firms to fund a transaction to purchase

17  EMAK's stock.

18       45.    Kurz sent a November 6, 2005 letter to Robeck requesting "an

19  opportunity to review the books and records of [EMAK] for the purpose of evaluating

20  strategic alternatives to maximize shareholder value, including a possible acquisition

21  of EMAK." Kurz's letter explained the possible benefits to EMAK shareholders of a

22  going private transaction, including value to shareholders, loss of the burden and costs

23  of being public, an opportunity to distribute substantial ownership stakes to

24  employees and improved competitiveness from not having to disclose sensitive

25  information publicly. Kurz expressed confidence that, if entertained, a going private

26  transaction would result in a premium over market value to common shareholders.

27  On information and belief, Kurz had lined up the financial backing for a going private

28  transaction from substantial private equity firms.

Second Amended Derivative Complaint

- 10 -

46.     By the time of the November 6, 2005 offer, Kurz had resigned as an officer and a Board member, and was an outsider as to EMAK. Again, a successful purchase of EMAK's shares by any Kurz-affiliated purchaser portended the end of the positions of most or all EMAK Board members.

47.     On information and belief, Robeck again reacted to due diligence request with an anti-Kurz animus, voicing opposition to the Board about giving Kurz an opportunity to buy the company for "cheap." Robeck urged that the Board not inform itself concerning the possibilities raised by Kurz's November 6, 2005 letter.

48.     On information and belief, Deutschman looked out for Crown's interests and not the interests of the EMAK common shareholders. In November 2005, EMAK's shares were trading at about $6.80 per share. Thus, even a premium payment over the share price, while resulting in a benefit to common shareholders, would have resulted in no premium to Crown and no bonus to Deutschman. Thus, Deutschman opposed the transaction in that it did not offer Crown and Deutschman the premium and bonus they were respectively seeking.

49.     On information and belief, on or about November 14, 2005, EMAK had hired Holbrook as CEO and had placed him on the Board. On information and belief, Holbrook was offered compensation in the form of salary at or in excess of $500,000 as well as generous bonus and stock option compensation. On information and belief, having just secured a high-paying CEO position with EMAK, Holbrook acted with self-interest rather than in the interest of the common shareholders by opposing a transaction which portended the termination of his new position.

50.     On information and belief, the remainder of the Board simply adopted these bad faith and self-interested positions, without seeking information from which they would independently evaluate the potential value to the common shareholders of the November 2005 proposal from Kurz.

51.     EMAK responded with a November 15, 2005 letter from Robeck. Again, while couched in language of business judgment, the letter communicated the

Second Amended Derivative Complaint

- 11 -

1    EMAK Board's refusal to share or receive information regarding any possible going

2    private transactions. The letter reflected continuing animus concerning Kurz's role in

3    the ZelnickMedia offer, and contained a "shot across the bow" for Kurz, urging him

4    "to be mindful of [his] obligations to EMAK pursuant to the separation agreement

5    executed between you and the company." The letter expressed the Board's desire to

6    back its new CEO, Holbrook, but did not explain how or why sharing and receiving

7    information concerning a going private transaction would have hindered the Board's

8    ability to simultaneously carry out its course with Holbrook.

9        52.    On information and belief, the Board's refusal to inform themselves

10   concerning the proposed going private transactions reflected an attitude of conflicted

11   loyalty, a conflict that caused the interests of the common shareholders, who were

12   entitled to the Board's undivided loyalty, to suffer, in favor of loyalty to themselves, a

13   loyalty to the maintenance of their positions as directors of a public corporation. On

14   information and belief, the Board's actions reflected knowing or deliberate

15   indifference to their obligations to act honestly and in good faith.

16              **Amendment to Crown's Preferred Stock Contract**

17       53.    On information and belief, in 2006 EMAK and Crown agreed to

18   restructure Crown's rights under its agreement with EMAK. Under this new

19   arrangement, Crown gave up its rights to its 6% annual dividend payment, and in

20   exchange the price at which Crown's preferred shares could be converted into

21   common stock was reduced from $14.75 per share to $9.00 per share.

22                   **The 2006 Proxy Contest**

23       54.    Apparently frustrated by the EMAK Board's refusal to even consider

24   the 2005 going private proposals, Kurz initiated a proxy contest in 2006, with the goal

25   of electing new directors and regaining control over EMAK. On information and

26   belief, the EMAK Board reacted defensively, and with the purpose of entrenchment,

27   by instituting a poison pill defensive maneuver to protect themselves and to ward off

28   the proxy contest.

Second Amended Derivative Complaint

- 12 -

55.     While the poison pill plan was dropped months after initiation of the proxy contest, which was eventually dropped as well, this incident both reflects and cemented an attitude of bad faith retrenchment and self-preservation by the Board. On information and belief, Holbrook was particularly threatened by any change in control associated with Kurz, which would have ended the tenures of the sitting Board members and Holbrook's employment as CEO of EMAK.

### EMAK Deteriorates in 2007

56.     In April 2005, the time of the ZelnickMedia proposal, EMAK's shares were trading at over $10 per share. In November 2005, the time of Kurz's request for due diligence, EMAK's shares were trading at about $6.80 per share. EMAK's share price was still at about $6 per share in January 2007, however, it sank quickly thereafter, to or just below $1.00 per share by December 2007.

57.     In the Summer of 2007, John Banks and Kim Thomson announced that they were leaving EMAK to start their own agency, and that they were taking with them that aspect of EMAK's valuable Burger King relationship that involved procuring licenses to offer entertainment products through Burger King restaurants. Although Banks and Thomson had employment agreements with non-compete covenants, the EMAK Board unwisely permitted them to leave the company and take the creative license aspect of the Burger King relationship with them. They left effective January 1, 2008. This departure left EMAK with the less profitable business of manufacturing and distributing the articles licensed by the departed creative team.

58.     On information and belief, the departure of Banks and Thomson, and thus of a portion of the invaluable Burger King account, a red flag, should have spurred the Board to implement and follow procedures to monitor the Burger King relationship and other key relationships for problems. On information and belief, the Board had no purpose higher than that of monitoring EMAK's relationship with its largest and most valuable client, not to mention its other valuable accounts. On information and belief, the Board failed in this duty.

1    59.    On information and belief, the Board suffered from a sustained and
2 systematic failure to exercise any oversight over EMAK's key client relations, such
3 that it could have discovered and taken steps to avert potential threats to EMAK's
4 relationship with Burger King or other key clients. The Board failed utterly to
5 attempt to assure existence of reasonable information and reporting systems in
6 relation to the health of its key client relations. Or, having set up such systems, the
7 Board consciously failed to monitor or oversee such systems, such that they were
8 uninformed concerning risks or problems requiring their attention.

9    60.    The Board's failure to implement or monitor client relation systems had
10 disastrous results. On information and belief, Holbrook learned as early as 2007 that
11 Burger King representatives did not like Holbrook. On information and belief,
12 Holbrook wrote a March 26, 2008 email that a Burger King representative was
13 supposedly "irrationally" "out to get" EMAK. On information and belief, Holbrook
14 learned other information in 2008 to the effect that Burger King representatives did
15 not like Holbrook and that the EMAK relationship with Burger King was at risk.

16    61.    On information and belief, Holbrook did not reveal this adverse
17 information to the Board. On information and belief, Holbrook suppressed the
18 information that he represented a risk to EMAK's most important client relationship
19 because of self-interest, as revealing this information could have imperiled
20 Holbrook's position. Rather than offer to resign to salvage the Burger King
21 relationship, or at least timely disclose this information to the Board and seek
22 direction, Holbrook did neither. On information and belief, Holbrook was motivated
23 by a disloyal desire to avoid embarrassment to himself, and ultimately to avoid losing
24 his position.

25    62.    On information and belief, Holbrook's breaches were not limited to
26 failing to disclose to the Board the adverse information he knew about EMAK's
27 relationship with Burger King. On information and belief, Holbrook made misleading
28 reports to the Board concerning the health of the Burger King relationship,

1    representing to the Board that the relationship was substantially healthier than he

2    knew it to actually be.

3         63.    The Board, having failed to implement or monitor any systems to

4    inform themselves concerning key clients of EMAK, failed to learn of this critical

5    fissure between EMAK and Burger King. Because of their abject failures to monitor

6    EMAK's key client relations, the remaining Board members remained ignorant of the

7    information suppressed by Holbrook and the true status of EMAK's relationship with

8    Burger King.

9         **The 2008 Defensive and Unwarranted Grant of Voting Shares**

10        64.    In 2008 the winds of discontent continued to blow. During nearly all of

11   2008 EMAK's share price was at or below $1.00 per share.

12        65.    On March 3, 2008 EMAK issued 925,000 shares of common stock to

13   seven EMAK senior executives, as supposed "bonuses." On information and belief,

14   these shares represented 15% of the outstanding common shares. These shares were

15   not restricted in their voting rights, but instead carried immediate voting powers.

16        66.    On information and belief, this remuneration to insiders was not earned

17   and was unfair to the common shareholders, given the poor performance of the

18   company. To the contrary, on information and belief, these shares were granted with

19   immediate voting rights for the sole purpose of warding off potential changes of

20   control, to create 925,000 additional votes in favor of entrenched management and

21   against any further advances by outsiders, including Kurz. This self-interested

22   transaction unduly diluted the pool of common shareholders, on information and

23   belief in bad faith and for the purpose of protecting the positions of existing Board

24   members.

25        **Potential Sale of EMAK**

26        67.    By mid-2008, EMAK itself took steps to put the company up for sale.

27   On information and belief, in or about July 2008 EMAK hired financial advisors

28

1 | Barrington & Associates and legal advisors Ropes & Gray to help evaluate and advise

2 | the Board concerning sale of all shares of EMAK.

3 |       68.    In 2008 and early 2009, EMAK received a number of written proposals

4 | to acquire EMAK's shares at prices ranging from $1.25 to $1.75 per share. During

5 | this time frame EMAK's shares from about $.90 per share to as low as about $.20 per

6 | share. Thus, these offers, if pursued and accepted, would have resulted in a premium

7 | to EMAK's common shareholders.

8 |       69.    EMAK received a June 9, 2008 proposal from Marlin Equity Partners.

9 | EMAK received a September 22, 2008 proposal from The ComVest Group. EMAK

10 | received a January 16, 2009 proposal from Housatonic Partners. All of these offers

11 | were for the purchase of EMAK's shares at premium prices. These offers represented

12 | a substantial potential benefit to the common shareholders, not only because of the

13 | potential premium price, but also the common shareholders were holding an illiquid

14 | stock.

15 |       70.    Although the EMAK Board had itself taken steps to sell EMAK, the

16 | Board failed to pursue these offers. On information and belief, rather than act with

17 | alacrity to provide due diligence and inform themselves concerning the proposed

18 | purchase offers, the Board dithered, failed to act and failed to inform themselves.

19 |       71.    On information and belief, the Board reacted, or failed to react to these

20 | offers through an anti-Kurz animus, the retrenchment and self-interest, and through a

21 | knowing and deliberate indifference to their obligations to act honestly and in good

22 | faith.

23 |       72.    On October 2, 2008, on information and belief because of adverse

24 | actions by NASDAQ, the exchange on which EMAK shares had theretofore traded,

25 | EMAK announced that it would voluntarily deregister its stock, which would

26 | henceforth trade over the counter.

27 |       73.    On information and belief, the interest of the prospective buyers waned

28 | while the Board failed to allow due diligence to proceed. On information and belief,

1    any remaining interest from prospective purchases finally ended when, in about early

2    April 2009, EMAK announced that it had lost the valuable MillerCoors account,

3    EMAK's second biggest client.

4        74.    On information and belief, the loss of the MillerCoors account was the

5    first, but not the most devastating, result of the Board's failure to implement or

6    monitor systems to inform themselves concerning key client relations.

7        75.    On information and belief, in allowing purchase offers to languish for

8    many months until all interest was quelled through news of the loss of EMAK's

9    second largest client reflected that the Board was not undertaking minimum efforts to

10    inform itself or carrying out duties to monitor key company activities.  Instead, on

11    information and belief, the Board wore blinders, and acted in a self-interested fashion.

12        76.    Kurz sent an April 13, 2009 letter to the EMAK Board recounting the

13    downward spiral EMAK had suffered and demanding that the Board terminate

14    Robeck and Holbrook and investigate and pursue breaches of fiduciary duty and gross

15    negligence.  A true and correct copy of this letter is attached hereto as Exhibit 1 (with

16    certain financial information redacted), and is incorporated herein.  The Board refused

17    to act on Kurz's demand.

18        **The Burger King Loss and the 2009 Consent Solicitation**

19        77.    Things went from bad to worse in late 2009.  According to EMAK's

20    financial statements for the Third Quarter 2009, Burger King still represented in

21    excess of 50% of EMAK's entire business.  That same financial statement discloses

22    that in September 2009 Burger King announced that it would no longer used EMAK

23    as an approved product manufacturing agency as of June 2010.

24        78.    Kurz wrote a letter on September 13, 2009 discussing and analyzing the

25    latest poor news and demanding inquiries and actions by the Board, including

26    termination of Holbrook.  A true and correct copy of this letter is attached hereto as

27    Exhibit 2 (with certain confidential information redacted), and is incorporated herein.

28    Again, the Board refused to act on Kurz's demands.

Second Amended Derivative Complaint

- 17 -

1    79.    Following this refusal, Kurz took action to initiate a consent solicitation

2  for control of the EMAK Board.

3    80.    Rather than conduct itself in a manner consistent with their fiduciary

4  obligations to the common shareholders, the Board, and particularly Holbrook, acted

5  in a disloyal manner to preserve their partisan interests.  These disloyal actions

6  included defensive maneuvers initiated in bad faith and for the sole purpose of

7  preserving the positions of entrenched Board members.

8    81.    In September 2009, on information and belief, with knowledge of the

9  possibility of a change in control, Holbrook approved new employment contracts

10  benefiting himself and other key executives calling for new and unwarranted bonuses,

11  as well as enhanced severance upon termination, and other unwarranted benefits and

12  consideration.  On information and belief, Holbrook approved contracts to insiders

13  providing that they would be paid significant sums as consultants post any change in

14  control.  On information and belief, this compensation was not earned, but was a

15  waste of corporate resources calculated to provide insiders with unwarranted payouts

16  in the event of a change in control.  On information and belief, this compensation was

17  given as a reward to insiders who would side and vote with entrenched management

18  against any change in control.

19    82.    On information and belief, as a defensive response to potential changes

20  in control, Board members and Crown formed in alliance wherein Crown would

21  prospectively be granted unwarranted new rights to vote against any potential Kurz

22  solicitation, in consideration for protecting the positions of entrenched Board

23  members.  In October 2009 the Board engineered an exchange transaction whereby

24  Crown would be granted immediate rights to vote with common shareholders on

25  Board positions.  On information and belief, there was no reason to grant Crown these

26  new and unprecedented rights, except as an unwarranted defensive maneuver to

27  protect an entrenched Board.  The proposed exchange transaction was not consistent

28  with the best interests of the common shareholders.  On information and belief,

1   Crown was solicited as an ally of the entrenched Board, and the transaction was

2   engineered to hand over to Crown a voting bloc sufficient to overcome votes in favor

3   of a Kurz-allied slate of directors. In September 2009 emails later uncovered through

4   independent investigation, Holbrook said "[Peter] Ackerman is now my partner" and

5   "[w]hat Peter wants to do is to be able to not let Don get control of the Board." On

6   information and belief, Crown was motivated by Kurz's prior refusals to approve

7   restructuring of Crown's preferred shares.

8          83.    On information and belief, EMAK wasted millions of dollars in legal

9   fees, charged to EMAK not only by EMAK's lawyers but also by Crown's lawyers,

10   defending these defensive and unwarranted actions.

11          84.    During the proxy period, EMAK's Board approved and sent a

12   December 7, 2009 letter to stockholders that reflected a palpably emotional diatribe

13   against Kurz, which reflected that the Board was incapable of objectively analyzing

14   and recommending response to the Kurz-lead consent solicitation. The December 7,

15   2009 letter reflected an irrational and partisan desire by the Board to blame all of the

16   company's woes, more than four years after his resignation, on Kurz and to rebuff any

17   move by Kurz that would result in loss of positions by entrenched Board members. In

18   its diatribe against Kurz's performance during his tenure as CEO, the EMAK Board

19   described "suffering," "losses" and "failed . . . strategies," descriptions that were

20   either not true or not disclosed in the disclosures that were contemporaneous with

21   Kurz's resignations, disclosures that were approved by then Board members for filing

22   with the SEC.

23          85.    Kurz and others filed an action in Delaware in which, among other

24   issues, the proposed transactions with Crown were challenged. Litigation over the

25   proxy contest ensued in Delaware. During this litigation the EMAK Board withdrew

26   the proposed exchange transaction with Crown. While the Board attempted to save

27   face by characterizing its withdrawal of the exchange transaction as a move to save

28   costs, on information and belief the proposed transaction was withdrawn on the eve of

1  a hearing in Delaware on the legality of the exchange (after the costs of defending the

2  exchange had already been incurred) to avoid an adverse ruling by the court.  As

3  further alleged below, the Delaware action is continuing for the purpose of assessing

4  damages for the assertion and then withdrawal of the improper self-dealing proposed

5  actions between EMAK and Crown.

6  　　　　86.　　On information and belief, the proposed actions to grant new rights to

7  Crown, for the purpose of providing additional votes in favor of entrenched

8  management, were without consideration and would have caused waste of corporate

9  assets.

10  　　　　87.　　EMAK has wasted its assets by, on information and belief, expending

11  millions in attorneys' fees defending in Delaware, and in this action, the unwarranted

12  and indefensible actions of the Board.

13  　　　　　　**The Findings of the Independent Committee**

14  　　　　88.　　In early 2010, the slate backed by Kurz apparently won the consent

15  solicitation.  The proxy contest results were approved by the Delaware Chancery

16  Court and went up for review to the Delaware Supreme Court.

17  　　　　89.　　While review of the results was pending, the newly elected directors

18  formed a committee to investigate the proposal to terminate Holbrook for cause.  The

19  committee engaged John Fox of Fox, Wang & Morgan, the lawyer who was retained

20  by the directors in the Walt Disney Co. derivative litigation to investigate whether

21  there was cause to fire Michael Ovitz for cause.

22  　　　　90.　　Fox and his partners met with the committee, gathered and reviewed

23  documents and talked to Holbrook and others.  The investigation resulted in a

24  recommendation that grounds to fire Holbrook for cause existed, primarily in relation

25  to his failure to disclose and address problems with the Burger King account, and also

26  over his orchestration of the exchange transaction with Crown in an attempt to

27  prevent removal of directors, including himself.

28

Second Amended Derivative Complaint

- 20 -

91.     On information and belief, according to the Fox report, grounds also existed for termination of Holbrook for cause for cultivating Crown, the preferred shareholder, as his "partner," and attempting to grant to Crown voting rights for the apparent purpose of defeating the Kurz insurgency and protecting Holbrook's own position. The committee found that, in addition to acting again to preserve his own position, Holbrook should have known that forming an alliance with Crown to protect the positions of entrenched directors would result in harm to EMAK and its common shareholders.

92.     On information and belief, the Board slate associated with Kurz sat on the EMAK Board from approximately February 2010 to April 2010, when the Delaware Supreme Court partially reversed, finding an error with certain votes in favor of the Kurz slate. As soon as the decision came down and the Kurz associated slate was unseated, a majority of the Board members, Deutschman and Rednor, voted to restore Holbrook to his prior position and ignore the Fox investigation and report.

### The Delaware Action

93.     In the aforementioned Delaware action, on July 19, 2010, the date of filing of this pleading, the court in Delaware granted a motion by plaintiff's counsel for a substantial interim fee award for having successfully contested and warded off the improper proposed transactions with Crown. On information and belief, during the hearing the judge found substantial evidence in connection with the events herein alleged of breaches of the fiduciary duties of loyalty by EMAK's Board.

### Derivative and Demand Futility Allegations

94.     Kurz sent an April 13, 2009 letter to the EMAK Board demanding that they investigate the actions herein alleged, and to take steps to redress the alleged breaches of fiduciary duty. (Exh. 1 hereto.) The letter recounted the alleged wrongdoing by Board members, and stated that if EMAK refused to take action, suit would be filed. The Board called no meetings, conducted no investigation and took no action in response to the April 13, 2009 demand, except to reject it.

Second Amended Derivative Complaint

- 21 -

95.      Kurz again sent a September 13, 2009 letter to the EMAK Board demanding that they investigate the actions herein alleged, and to take steps to redress the alleged breaches of fiduciary duty. (Exh. 2 hereto.) The letter recounted the alleged wrongdoing by Board members, and stated that if EMAK refused to take action, suit would be filed. The Board called no meetings, conducted no investigation and took no action in response to the September 13, 2009 demand, except to reject it.

96.      In the alternative, these demands were futile, and the demand requirement is therefore excused, in that a majority of the Board members at the time such demands were made had directly engaged in or ratified the wrongful conduct herein alleged, had engaged in patterns of entrenched and disloyal behavior, had conducted themselves in bad faith, had failed to carry out their duties to inform themselves and maintain reasonable oversight and ignored repeated warnings and entreaties to take action to protect EMAK's common shareholders.

97.      On information and belief, in 2009, when Kurz's demands were made, and which were in any event futile, the Board consisted of Robeck, Holbrook, Deutschman, Rednor and Bland. Kurz served on the Board for starting in June 2009. On information and belief a majority of the Board, if not all Board members other than Kurz, were not capable of fairly evaluating the issues herein alleged, in that the actions herein alleged, which were undertaken or ratified by these Board members, were not the product of a valid exercise of business judgment. Further, the Board members who were to have evaluated any demand had engaged in a pattern of disloyalty and entrenchment and have authorized waste of corporate assets.

98.      Robeck had over the years earned substantial amounts through his service on the Board. As alleged herein, on information and belief Robeck was the architect of the policy against considering going private transactions, which he associated with Kurz. Robeck breached his duties of loyalty by engaging in the behavior herein alleged. On December 7, 2009, shortly after the time the Board was to have objectively considered the Kurz demands and the issues herein raised, Robeck

1    authored or ratified issuance of an emotional anti-Kurz screed, which reflected an

2    inability to objectively investigate, consider and act upon the matters herein alleged.

3    Robeck acted in bad faith by failing to take any steps to follow through on the offers

4    to purchase EMAK's stock herein alleged, nor to implement or monitor systems to

5    obtain information concerning EMAK's relations with key clients.  Robeck voted in

6    favor of the improper and unwarranted defensive measures herein, which were

7    initiated for the purposes of entrenchment, giving Robeck and other sitting directors

8    greater voting power to resist any change in control represented by the Kurz consent

9    solicitations.  Robeck authorized waste of corporate assets.  Further, Robeck was

10   incapable of objectively weighing any demand that he be terminated for cause.

11        99.    Holbrook is an inside director, at all times earning substantial

12   compensation from serving as an officer and director of EMAK.  As alleged herein,

13   Holbrook was the apparent architect of the anti-Kurz screeds authored by the Board,

14   on information and belief reflecting his attempt to preserve his position and deflect

15   scrutiny of unfortunate events occurring on his watch.  On December 7, 2009, shortly

16   after the time the Board was to have objectively considered the Kurz demands and the

17   issues herein raised, Holbrook authored or ratified issuance of an emotional anti-Kurz

18   screed, which reflected an inability to objectively investigate, consider and act upon

19   the matters herein alleged.  As alleged herein, Holbrook acted in an egregious fashion

20   by failing to disclose to the Board that he could be the cause of losing EMAK's

21   largest account, again in an apparent attempt to save face and his position.  On

22   information and belief, Holbrook not only suppressed vital information concerning his

23   own role in damaging the relationship with Burger King, but Holbrook mislead the

24   Board with untrue reports concerning the health of the Burger King relationship.

25   Holbrook acted in bad faith by failing to take any steps to follow through on the offers

26   to purchase EMAK's stock herein alleged, nor to implement or monitor systems to

27   obtain information concerning EMAK's relations with key clients.  Holbrook voted in

28   favor of the improper and unwarranted defensive measures herein, which were

1  initiated for the purposes of entrenchment, giving Holbrook and other sitting directors

2  greater voting power to resist any change in control represented by the Kurz consent

3  solicitations.    Holbrook enlisted Crown, to whom Holbrook did not owe fiduciary

4  obligations, as his "partner" to the detriment of common shareholders and for the

5  purpose of preserving his own position.    Holbrook authorized waste of corporate

6  assets.    Further, Holbrook was incapable of objectively weighing any demand that he

7  be terminated for cause.

8          100.    As alleged herein, Deutschman was placed on the Board pursuant to

9  Crown's right to nominate directors, and indeed Deutschman works for a Crown

10  affiliate.    On information and belief, throughout these alleged transactions

11  Deutschman served the interests of Crown and himself, not the interests of the EMAK

12  common shareholders.    Deutschman was promised personal remuneration for

13  advancing the interests of Crown, and not the common shareholders.    On information

14  and belief, Deutschman breached fiduciary duties by voting against pursuing

15  proposals that would result in potential premiums to common shareholders, but not to

16  Crown and which would not personally enrich Deutschman.    Deutschman participated

17  in the self-interested behavior alleged herein, and failed to undertake minimum efforts

18  to inform himself and monitor events.    On information and belief, Deutschman acted

19  disloyally to preserve his position.    On December 7, 2009, shortly after the time the

20  Board was to have objectively considered the Kurz demands and the issues herein

21  raised, Deutschman authored or ratified issuance of an emotional anti-Kurz screed,

22  which reflected an inability to objectively investigate, consider and act upon the

23  matters herein alleged.    Deutschman acted in bad faith by failing to take any steps to

24  follow through on the offers to purchase EMAK's stock herein alleged, nor to

25  implement or monitor systems to obtain information concerning EMAK's relations

26  with key clients.    Deutschman voted in favor of the improper and unwarranted

27  defensive measures herein, which were initiated for the purposes of entrenchment,

28  giving Holbrook and other sitting directors greater voting power to resist any change

1  in control represented by the Kurz consent solicitations. If Crown was opposed to the

2  Kurz consent solicitation, Crown presumably did, or would have, inveighed upon

3  Deutschman to vote against Kurz's demands to investigate and possibly assert claims

4  against the Board.

5      101.  On information and belief, Rednor and Bland were outvoted, dominated

6  and/or controlled by the majority represented by Robeck, Holbrook and Deutschman.

7  Rednor and Bland had over the years earned substantial amounts through their service

8  on the Board. Rednor and Bland breached their duties of loyalty by engaging in the

9  behavior herein alleged. On December 7, 2009, shortly after the time the Board was

10  to have objectively considered the Kurz demands and the issues herein raised, Rednor

11  and Bland authored or ratified issuance of an emotional anti-Kurz screed, which

12  reflected an inability to objectively investigate, consider and act upon the matters

13  herein alleged. Rednor and Bland acted in bad faith by failing to take any steps to

14  follow through on the offers to purchase EMAK's stock herein alleged, nor to

15  implement or monitor systems to obtain information concerning EMAK's relations

16  with key clients. Rednor and Bland voted in favor of the improper and unwarranted

17  defensive measures herein, which were initiated for the purposes of entrenchment,

18  giving Rednor and Bland and other sitting directors greater voting power to resist any

19  change in control represented by the Kurz consent solicitations. Rednor and Bland

20  authorized waste of corporate assets.

21                **First Cause of Action**

22          **Breach of Fiduciary Duty (Duty of Loyalty)**

23            **Against All Director Defendants**

24      102.  Plaintiffs refer to Paragraphs 1 through 101 above, which they

25  incorporate by reference into this cause of action.

26      103.  The Defendant directors of EMAK owe the highest fiduciary obligations

27  to EMAK and its common shareholders, including the duty to give to EMAK and its

28  common shareholders their undivided loyalty, and to avoid self-interested behavior.

1    104.    These Defendants breached their fiduciary duties of loyalty by engaging

2    in the self-interested behavior herein alleged, in bad faith and for purposes of

3    entrenchment.  On information and belief, in acting as alleged above, these

4    Defendants were motivated by a desire to protect themselves and preserve their

5    positions and the associated remuneration for serving in those positions.

6    105.    The breaches of the Defendants herein constitute bad faith, waste and

7    intentional misconduct.

8    106.    On information and belief, the Board failed to implement and then carry

9    out their basic duties to monitor corporate events, including potentially valuable offers

10    to purchase EMAK shares and potential loss of key accounts.

11    107.    As an actual and proximate results of these Defendants' breaches,

12    EMAK, the Nominal Defendant, has sustained damages in an amount to be proven at

13    time of trial, in no event less than $100 million.

**Second Cause of Action**

**Breach of Fiduciary Duty (Duty of Due Care)**

**Against All Director Defendants**

17    108.    Plaintiffs refer to Paragraphs 1 through 101 above, which they

18    incorporate by reference into this cause of action.

19    109.    In engaging in the foregoing conduct, the Defendant directors of EMAK

20    breached their fiduciary duties of due care.  In engaging in these breaches, the

21    Directors were <u>not</u> engaging in informed exercises of business judgment, such that

22    they could urge protection of the "business judgment rule" or of any covenant by

23    which EMAK attempted to exculpate them from liability from ordinary negligence.

24    110.    Rather, the breaches of the Defendants herein constitute bad faith, waste

25    and intentional misconduct.

26    111.    On information and belief, the Board failed to carry out even minimum

27    duties to investigate and obtain information.  In the absence of such information, the

28

Second Amended Derivative Complaint

- 26 -

1 | Board was not making reasoned business judgments based upon full information, but
2 | rather no judgment at all.

3 | 112. On information and belief, the Board failed to implement and then carry
4 | out their basic duties to monitor corporate events, including potentially valuable offers
5 | to purchase EMAK shares and potential loss of key accounts.

6 | 113. As an actual and proximate results of these Defendants' breaches,
7 | EMAK, the Nominal Defendant, has sustained damages in an amount to be proven at
8 | time of trial, in no event less than $100 million.

9 | **Third Cause of Action**

10 | **Breach of Fiduciary Duty (Sale of Company)**

11 | **Against all Director Defendants**

12 | 114. Plaintiffs refer to Paragraphs 1 through 101 above, which they
13 | incorporate by reference into this cause of action.

14 | 115. The Defendant directors of EMAK were under a duty to seek to
15 | maximize value to common shareholders in evaluating the potential sale transactions
16 | brought to their attention.

17 | 116. Instead of carrying out such duties, the Board instead acted in the self-
18 | interested and grossly negligent fashion herein alleged. On information and belief,
19 | the Board failed to maximize value for the common shareholders. On information
20 | and belief, the Board failed to carry out even minimum duties to investigate and
21 | obtain information concerning these proposed sales. In the absence of such
22 | information, the Board was not making reasoned business judgments based upon full
23 | information, but rather no judgment at all.

24 | 117. The Board's failures to act to obtain the highest price reasonably
25 | available to common shareholders resulted in substantial losses in an amount to be
26 | proven at time of trial, in no event less than $100 million.

27 | .

28 |

Second Amended Derivative Complaint

- 27 -

1

### Fourth Cause of Action

### Breach of Fiduciary Duty (Duty of Disclosure)

### Against Holbrook

118.   Plaintiffs refer to Paragraphs 1 through 101 above, which they incorporate by reference into this cause of action.

119.   As a director and officer of EMAK, Holbrook was under the highest legal duties to disclose all material information to EMAK's Board.

120.   Holbrook suppressed, and failed to reveal, critical information that EMAK's relationship with Burger King was in peril, and that Holbrook himself was potentially the cause of loss of that valuable account.

121.   On information and belief, in suppressing this information, Holbrook intended to and did induce inaction by the EMAK Board.  On information and belief, the Board relied on Holbrook's suppression of facts by failing to take steps to preserve the Burger King account, including removing Holbrook from contacts with Burger King or even terminating Holbrook from EMAK.

122.   In addition to suppressing facts, Holbrook mislead the Board by giving unduly positive information concerning EMAK's relationship with key clients, particularly Burger King, information which was misleading for want of disclosure of the suppressed information.

123.   As an actual and proximate result of Holbrook's acts of nondisclosures, EMAK, the Nominal Defendant, has sustained damages in an amount to be proven at time of trial, in no event less than $100 million.

### Fifth Cause of Action

### Aiding and Abetting

### Against Crown, Ackerman and Does 1-100

124.   Plaintiffs refer to Paragraphs 1 through 101 above, which they incorporate by reference into this cause of action.

Second Amended Derivative Complaint

- 28 -

1    125.   On information and belief, Crown, Ackerman and Does 1-100 induced,

2  aided and abetted the breaches of fiduciary duty herein alleged.

3    126.   On information and belief, Crown, Ackerman and Does 1-100 knew that

4  the conduct of the Defendant directors of EMAK constituted breaches of their

5  fiduciary duties and have given substantial assistance or encouragement to these

6  defendants to so act.

7    127.   On information and belief, Crown, Ackerman and Does 1-100 have

8  given substantial assistance to the Defendant directors of EMAK in accomplishing a

9  tortious result and their conduct, separately considered, constitutes a breach of duty to

10  EMAK and its common shareholders.

11    128.   As an actual and proximate result of these acts of inducing, aiding and

12  abetting, EMAK, the Nominal Defendant, has sustained damages in an amount to be

13  proven at time of trial, in no event less than $100 million.

14  ## PRAYER FOR RELIEF

15  WHEREFORE, Plaintiffs pray for the following relief:

16    A.   An award of actual damages in favor of EMAK in an amount to be

17  proven at time of trial, in no event less than $100 million.

18    B.   As an alternative to an award directly to EMAK, which remains in

19  control of certain of the director Defendants named herein, an order that any judgment

20  be distributed directly to EMAK's common shareholders in proportion to their

21  holdings, and that Crown shall have no rights and receive nothing in connection with

22  such distribution.

23    C.   An award of Plaintiff's reasonable attorneys' fees and litigation costs.

24

25

26

27

28

Second Amended Derivative Complaint

- 29 -

1      **D.**    Such other and further relief as may be warranted by the evidence and

2 which this Court may deem just and proper.

3

4 DATED: July 29, 2010         SPILLANE WEINGARTEN LLP

5

6

7                           By: _____

8                               Jay M. Spillane
                    Attorneys for Plaintiffs Robert J. Farina and

9                     Gryphon Promotions, Inc., derivatively on behalf
                    of Nominal Defendant EMAK Worldwide, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



**IN sight**
Creative Solutions, Inc.

**DON KURZ**
president, ceo

9785 Drake Lane
Beverly Hills, CA 90210
:929-899-0024
:310-246-9677
don@kurzink.net

April 13, 2009

Board of Directors
EMAK Worldwide, Inc.
6330 San Vicente Boulevard
Los Angeles, CA 90048

Sent via email and registered mail

Gentlemen:

I read about the Company's loss of its second biggest client, MillerCoors. This is a devastating blow to a Company that has been spiraling down hill for the past four years and seriously impairs the value of its best asset- Upshot.

I was expecting to finalize the final $  million in financing for the proposed Upshot transaction this week. Obviously, the $  million valuation plus closing expenses is no longer feasible and I am not sure what price, if any, Housatonic Partners would be interested in, given the uncertainty that this client loss presents.

The purchase of the Products business, which I have also been actively pursuing with two qualified buyers, is now pointless, as the combined sale of the two assets (assuming, again, that Housatonic would still have an interest in purchasing Upshot), will clearly be below $25 million. Given the existing preferred stock security in place, this would effectively wipe out the common equity- a result that is unacceptable.

My shareholder group, which represents approximately 2.6 million common shares, or about 41 percent of the total outstanding common shares, views the current situation as intolerable. This share base does not include the substantial number of additional shares that I believe would back my group in the event of any action or vote. You will note that I am using 6.3 million common shares in this calculation and not including the improper 2008 grant of 925,000 shares of restricted stock (as opposed to the Company's consistent past practice of granting RSU's). This highly dilutive grant to reward abysmal performance was made with immediately, though unvested, voting shares in a clear attempt to dilute outside shareholder voting. In any future dispute, this grant will be aggressively challenged.

I have explicitly communicated to the Company for the past 3 1/2 years that the business was on a downward spiral. These communications with various Board members, including the Chairman and the CEO, were via phone calls, SEC filings, in person meetings and a halted proxy contest in 2006. (I urge you to read the letter I wrote to Jim Holbrook on April 11, 2006, where I outlined my concerns and recommended a specific course of action.) Regrettably, my warnings fell on deaf ears. This is particularly galling given my status as the largest common shareholder and former CEO who, by virtually

1

any objective standard, had a very successful tenure. We are now left with a deregistered, $.21 bid, illiquid Pink Sheet traded stock, and a broken capital structure that has virtually no chance to recover. I invite you to examine history and see how many stocks with these characteristics ever recover -- you will not be encouraged.

Over the past four years, I have made numerous overtures to the Board about doing what is right for stakeholders- namely taking the Company private. The first overture was for $ per share in April, 2005, which would have rewarded the common and preferred shareholders and provided a more favorable operating environment for the Company's clients and employees. By refusing to even meet with my private equity sponsor, the Board showed its confidence in the Company and its bright future. Mysteriously, a week or so after this go-private overture, I was unceremoniously forced out of the Company that I served for 15 years, with my full equity stake now entrusted to a yet un-named CEO. This colossal miscalculation has cost me about $16 million based upon the trading price of EMAK upon my resignation and over $22 million relative to my proposed buyout price. Subsequent overtures to the board were met with the same inexplicable "head in the sand" response. The most recent example was the stonewalling of Marlin Equity Partners who made an all cash, no financing contingency bid of $ million in June, 2008. Instead of embracing this opportunity and permitting full due diligence (after all, it was backed by my shareholder group and the preferred stockholder), they were deliberately put off until they became fed up and walked away. Marlin's principal remarked to me "I am tired of getting jerked around; this Company is not a willing seller". That transaction would have paid the preferred in full and gotten the common shareholders liquidity and close to $ per share. Given Marlin's track record of closing quickly, that deal could have been completed within three months. I view the Company's conduct toward the Marlin proposal as a gross breach of fiduciary duty for which every member of the Board should be held accountable.

### Now What

Let me be perfectly clear about my intentions going forward. There is one -- and only one – alternative that is acceptable to my shareholder group, and I believe the vast majority of outside shareholders. That is to terminate the current Chairman and the CEO. This is the type of move the company boards of Apple, Dell, Schwab, Starbucks and others have done when their once high performing companies fell into a downward spiral. And they acted well before they were in the type of crisis the Company finds itself in.

With Stephen Robeck as Chairman, Jim Holbrook has had 3 ½ years as CEO and they have literally run the Company into the ground. This demonstrable and staggering incompetence can neatly be summarized by the following events:

- The loss of critical fee revenue from the Company's largest client, losing the agency of record business and creative services business to BMAK employees who somehow were allowed to take the business with them. Not only was this a significant profit blow, but it also hurt morale and the Company's credibility in the entertainment community.

2

- The loss of the MillerCoors business that was just announced. This is the second time in the past five years Jim has lost that business (first as head of Zipatoni, who we won the Miller business from in early 2005). As far as I can tell, this came as a complete shock to the Company. If that is the case, it is indicative of not being close to your largest Upshot client (just like the case with Burger King). Clients' don't just pull large pieces of business without meaningful signals.

- The hiring of Peter Boutros to head the Products business was an enormous mistake. Any industry check on his past performance and operating style would have indicated he was the absolute worse possible hire for such a key position-particularly given Jim's lack of product experience. That has turned out to be a multi-million dollar mistake and very costly to the EMAK brand.

- Constant restructurings such that it seems that every quarter there are more special charges and more terminations with no strategic direction. The bottom line is the Company has lost money every year Jim has been in charge, along with a dramatic shrinking of the revenue base. There is no skill in cost reduction. The skill is in a coherent, clearly communicated plan that, as a component, rationalizes the cost structure to achieve the Company's goals.

- The Company has an overhead structure that is literally choking its vitality. I am surprised that the business units don't mutiny in a form of "taxation without representation."

- The purported integration of the Product acquisitions has been incoherent and reactive. What has become of Logistix, which generated excellent returns for three years, is simply tragic. With the possible exception of SCI, each acquisition made this decade should have yielded targeted returns on capital, on top of the diversification benefits.

- Even before the MillerCoors loss, Jim gave the uninspiring guidance of "positive EBITDA before charges in 2009, approximately flat when compared to 2008 and we should have positive net cash flow for the year". Sounds like we were in for another net loss. Now with the loss of a major client, I shudder to think what the results will be.

Finally, it is beyond astounding to me that Jim continues to live in St. Louis, with a very rich compensation package and, presumably, a robust travel budget. The Company is fundamentally a people business, and you don't inspire people when you are often detached from the employees. There is no morale or *espirit de corp* within EMAK and there hasn't been in the past four years. To be perfectly candid, the Board's actions in watching Holbrook run the Company into the ground over the past 3 ½ years is inexcusable. Any lawyer will tell you that the "business judgment rule" doesn't excuse "no judgment."

3

To the extent time has distorted your views of the past, the Company that I left four years ago:

- Averaged $13 million in EBITDA during my tenure as CEO
- Generated $61 million in cash from operations during this six-year period
- Had a record first quarter 2005 revenue (my last quarter as CEO), having won major accounts from Miller, Kraft and others
- Had turned around Upshot, which was purchased out of bankruptcy two years earlier and was key to the Company's diversification strategy
- Was consistently paying the preferred stock dividend with no foreseeable risk of default
- Had an enterprise value of about $100 million
- As noted above, had attracted considerable interest from numerous private equity firms, including the $15/share indication around the time of my departure;
- Enjoyed an outstanding relationship with Burger King, having recently won all of the kids and family promotional agency of record work, 100% of the premiums creative work and a significant majority of the global premiums manufacturing work
- Had a reputation for the highest ethical standards, and for attracting and retaining the industry's best and brightest.

### Going Forward

I am demanding that the Board terminate Robeck and Holbrook immediately. I will then work with the Board to modify the plans I have developed for the buyout and get the Company focused and right-sized to ensure immediate profitability. I will also bring in outside capital as needed. I will work closely with the preferred shareholder to develop a plan to allow him to exit his investment at the earliest possible time at the best possible valuation.

If the Board chooses not to execute my proposal, I, along with my fellow shareholders, will seek to remove all the common shareholder representatives on the Board as soon as possible. Further, my shareholder group and I will file suit against the Board and each current and former director for their breach of fiduciary duty and gross negligence, as this group has stood idly by and watched shareholders get wiped out. The Company can ill afford the time and cost of this litigation, but you will leave us no choice.

Let me be crystal clear about my intentions. I fully intend to recover significant value for my 15 years of hard work building EMAK. It will either be through coming in and working in partnership with key stakeholders and turning around the Company, or through proceeds from litigation via the Company's D&O insurance and directors' personal assets. I will not abide the complete loss of my equity stake in EMAK because of the Board's intransigence, the egos of Holbrook and Robeck, or other self-interested motivations. I am rightfully angry and frustrated by the failures of the Board and management in the operation of the Company since my departure. You can be assured

4

that I will be relentless in my pursuit. My legal advisors have assured me that you are all walking a very slippery slope. I trust you will govern yourselves accordingly.

Your response is required by the close of business Friday, April 17, 2009.

Sincerely,

Donald A. Kurz

Cc: Debra Fein
     Daniel O'Connor
     Alfred Osborne, Jr.
     John Kirkland, Esquire

5

# EXHIBIT 2



**INsight**
Creative Solutions, Inc.

**DON KURZ**
president, ceo

9765 Drake Lane
Beverly Hills, CA 90210
323-999-0024
310-246-9677
don@kurzink.net

September 13, 2009

Board of Directors
EMAK Worldwide, Inc.
6330 San Vicente Boulevard
Los Angeles, CA 90048

Dear fellow Board members:

We as a Board and Company are standing at the edge of an abyss.

We as a Board are failing to do our jobs and as a result our Company's value is at risk of imminent destruction. As our market value plummeted over the past four plus years, the Board sat on the sidelines as an absentee CEO did nothing. We lost the most strategic and profitable elements of our largest client's business, and the Board did nothing. We lost our second largest client, and the Board did nothing. We spent months working on a deal with a rightfully unhappy preferred holder, only to be undermined by the CEO. The common stockholders are on the verge of open revolt and we have done nothing but ignore and rebuke them. Now, we are at great risk of losing the remaining business of our largest client, which will ensure the destruction of the Company's value and massive litigation, and we are doing nothing. I hope that Jim enjoys the end of summer in St. Louis and that Stephen has a good time hiking in the Sierra Mountains, but I fear the Company will be destroyed by the time anyone starts paying attention.

Since my letter to the Board on April 13, 2009 (attached for your reference), I have attempted in good faith to find a resolution to the fundamental problems that exist for the Company and its stakeholders. I presented my thoughts to the un-empowered Special Committee of the Board on what needed to be done to turn around EMAK. I accepted the Board's invitation to rejoin it, believing that the offer was made in good faith and that my experience and analytical capabilities could help illuminate core problems and appropriate solutions. I took the time to meet one on one with all key members of management (in spite of Jim Holbrook's attempts to block this), learning about their priorities and challenges. I dove into all the Board material and the Company's numbers to ensure I was as knowledgeable as possible and could add value to discussions.

In addition, I have continued to try to find and present solutions to the very real stockholder problems of low valuation and no liquidity. These proposed solutions, which cover my pre and post-Board membership, include:

- Repeated attempts to buyout the Company at a premium to market and fully pay off the preferred stockholder. At every turn, these attempts were met with either outright refusal to consider by the Board (i.e. not even willing to discuss), or half-hearted attempts to make a show of allowing due diligence in a poor

1

prospective buyer would lose patience. After all, EMAK is no longer such a
prized asset that buyers will jump through hoops to pursue.

- As part of these buyout pursuits, I have tried to engage the preferred stockholder
to find a resolution to his very real dilemma of being stuck in a no-yielding
instrument with no ability to force liquidity. This engagement included insisting
to my various private equity sponsors over the years that the preferred had to be
paid in full (even though their view was that its value was impaired) for a deal to
go through, as well as the recent good faith effort to split up the Company.

- I have urged the Board to support a special stockholder meeting so that the
common stockholders—who are our owners—could actually have a voice in who
represented them and, in return, the Company can reach alignment with the
majority of common stockholders. My resolution at Wednesday's board meeting
proposing this did not get one vote besides myself. Instead, the Board's solution
is "just say no."

- I have urged the Board to change the CEO given the colossal failure of the
incumbent, heightened by the current crisis at our largest client, which multiple
sources, including our own management team, have told us is exacerbated if not
caused by his incompetence. We are not ostriches and cannot blindly believe a
CEO who we know is not telling us the truth. My resolution proposing this at
Wednesday's board meeting did not get one vote besides myself. Instead, we
continue fiddling while Rome burns.

In the three months I have been on the Board, my worst fears have been realized. The
Board is rife with conflicts of interest, is dominated by the preferred stockholder's
unreasonable demands, does not monitor the CEO or hold him accountable for anything,
and fundamentally fails in its exercise of its fiduciary duty. As the Company's largest
common stockholder, this is completely unacceptable, and as a member of the Board I
find this both shocking and embarrassing.

Below, I have attempted to summarize the specific issues that have arisen since my last
correspondence with the Board in April.

- **Burger King.** On August 4, I received a call from a knowledgeable service
provider who stated in confidence that he had heard from three different areas of
Burger King Corp. that they were planning on going sole source premiums supply
with Premium Surge, our competitor. Consistent with my duties as a Director, I
immediately spoke with each independent Director about this issue. (Fortunately
I was on the Board or they still might be in the dark about this precarious
situation.) This lead to a full Board conference call where the CEO invited our
BK management team to participate. On that call, the management team stated
they believed the situation was indeed perilous and summarized some of the
previous warnings that were conveyed to EMAK from sources such as ;    . and
, going back 18 months or so. Jim claimed to be involved with the
BK situation and that he visited Miami quarterly (a statement we now know to be
a lie), but failed to explain why he either had no inkling of how bad things were or
had failed to meet his obligation to promptly advise the Board of such a serious

2

problem. No conclusions were reached on what to do after this call. The BMAK BK management team subsequently called me to take me up on my offer to assist with a presentation they were developing. In that conversation, they made the bold decision to share some of the background as to what is really going on in Miami. They did it in the context of this being a very bad situation for EMAK and its stockholders and they felt a duty to disclose the issues. Given I am a Director, as well as the Company's largest common stockholder and have a long-standing relationship with these executives', they reached out to me. They noted they didn't believe our CEO was looking out for our stockholders and our employees- only his career. They then went on to state that the entire problem we have at Burger King is the negative relationship Jim Holbrook has with BK Marketing- the ultimate decision makers for premiums and promotions. They believe there is bad blood and                , and                 - the two key BK Marketing executives- will not deal with him. They noted that any solution to this crisis should not involve Jim contacting or visiting BK Marketing and that EMAK needed to make a bold move to try and arrest this deteriorating situation, including changing the CEO. Anything short of this they believed would have a low probability of success. At my urging, our executives relayed this information to two additional Board members- Stephen Robeck and Howard Bland.

Apparently, as noted by our executives, Jim has no real connection with anyone in our Products business and spends minimal time with our people. He has had virtually nothing to do with this business out-performance so far this year that has enabled the Company to currently forecast improved profitability over its very modest budget. In fact, as I note below, the Products business is suffering from lack of top management attention, as its long term strategy is highly uncertain. Our executives noted that they believe Jim has visited BK only twice in the past two years, instead of the quarterly annual visits Jim told the Board and that it was highly doubtful he spoke with                 at                 several times a month as he claimed. These executives would certainly have heard about visits and Jim would very likely tell them about it and require briefings before any meetings. Mis-representing to the Board what you are doing with our largest client, who is in crisis, is a very serious matter. Further, if there are quarterly visits and multiple monthly calls, wouldn't Jim know that the client was planning on eliminating EMAK as a supplier?

So I ask our Board, how can we have a CEO who has a negative relationship with the decision makers at our largest client- particularly having just witnessed the loss of our second largest client? What have we done since March 2008 when we evidently first heard about potentially getting fired at BK- on top of the massive loss of business we had already experienced? What has our strategy now is to have Jim call                 at BK Marketing, whom he presumably hasn't spoken to in a long time, coupled with trying to work with RSI to send off some presentation that will show significant price reductions. This flies in the face of what our BK management team said we need to do- get fundamentally connected to BK Marketing as soon as possible. Our issue isn't

3

price or day to day performance. That is universally applauded. The issue is a toxic relationship with the decision makers that must be remedied. We are now proceeding down a path with a very low probability of success, refusing to recognize reality. The loss of BK will be devastating to the Company, its reputation and its profitability and will essentially be the end of the Products business- the historic anchor and source of cash flow. Keeping the client at the cost of massive price reductions would be little better, and would reinforce our dwindling competitive position as a pure manufacturing vendor- not a core client partner. In the midst of this, Stephen just left for a 10 day hike where he is presumably not even reachable, and he is the one clearly calling the shots. I look forward to hearing how this jives with doing our best to save a company in crisis.

I left the Company over four years ago with the BK relationship at an historic high, with two very profitable AOR's, 100% of the premiums creative business and the majority of the global manufacturing business. I was negotiating with RSI before I left about EMAK becoming the sole source manufacturing supplier and potentially purchasing our competitor Premium Surge. Several years earlier, I had successfully led our Company through two enormous crises with BK- Pokemon and Ameriserve. I had taken over as sole CBO after a very difficult and unprofitable year in 1998, but managed to deliver a record 1999. The Board and CEO now somehow blame our ex-executives,          and for poisoning the BK relationship because of their disdain for Jim. Perhaps that is true, but what have we done about it? Nothing! And nobody takes any responsibility. Unbelievable.

Finally, for the record, I have not spoken to anyone at BK Marketing or RSI in at least two years. I have nothing to do with fomenting this situation. Further, I haven't been in contact with our BK management,             and         ; for years prior to this recent event (other than the getting reacquainted lunch that I had with them and other members of management this summer). Clearly, I haven't done anything to interfere with or influence anyone. These two executives should be commended for stepping forward on their own and any attempt to reprimand them would be a gross injustice that would not be tolerated.

- **Governance and Conflict of Interests.** Among others, I note two particularly egregious conflicts on our Board. Firstly, in an attempt to preserve his own job, our CEO is shamelessly pushing the preferred stockholder's agenda at the expense of common stockholders. As highlighted in the attached email dated July 21, 2009, he notes that the Company essentially cannot grow with the current capital structure. This is patently absurd and again reflective of someone who takes no responsibility and just does not get it. The preferred's presence on the balance sheet is not an impediment to growth or anything else. The problem has been continual losses and the collapse of confidence in the Company as reflected in the stock price. This has markedly shrunken our value pie to the point where the preferred represents a disproportionate amount of the Company's value. The fair solution is not to give one shareholder a bigger slice; it is to create a bigger

4

pie. A coherent strategic plan well executed solves this. Four and a half years ago the Company's enterprise value was about $100 million and the preferred represented a targeted 25% of the capital structure. In this same email, Jim then goes on to say "The preferred is not going to quiet down, go away, give us an extension, or be happy with the status quo. We will eventually break the Company up and divide the assets......" Extension for what? The preferred holder is a highly sophisticated business person who heavily negotiated his own deal, and is not entitled to be converted now at a special price to the great detriment of our common stockholders. For the thousandth time, we do not need to do what the preferred wants, and cannot, unless it is also in the interests of the common stockholders.

The capital restructuring alternative we have most actively considered (and spent large amounts of time and money on) is breaking up the Company. The preferred fundamentally rejected the serious and fair proposal we made in August on this deal. We have no way of knowing what effect Jim's sending competing proposals, without Board approval, had on the preferred's thinking, but if it led him to believe we are willing to sell out the common shareholders then why should he be reasonable? Given Jim's assumed knowledge of our BK risk, was he going to disclose this to us before the deal went too far? Although it should be our lowest priority given the exigent business circumstances we are in, Jim seems totally focused on getting a preferred transaction done, as he believes it would either trigger his excessive severance deal of 2X compensation or he would be running Upshot, unencumbered by his failure in the Products business he doesn't seem to like and not having to bear the massive difficulty of actually visiting the LA headquarters once a month. Never mind that the common stockholders could have been stuck with a worthless asset that his horrendous management yielded.

As far as correspondence goes, nothing can compare to the September 7, 2009 letter to the Board that Jim sent. I have never seen a piece of revisionist history quite like this, where failures are turned into accomplishments and Jim takes credit for remarkable feats. I attach it, along with my response, for your reference. Aside from lacking any semblance of humility, he takes no responsibility for anything. Somehow, after almost four and a half years, I am to blame for anything wrong. For example, does Jim or the Board care to acknowledge that I led the acquisition of Upshot, which now represents the vast majority of the Company's value? Upshot was mired in bankruptcy and unprofitable at the time and, working closely with                    who I chose as the leader over Upshot's founder, we turned around the business culminating with the enormous Miller win in early 2005. Fortunately, Upshot remains a vibrant entity, in spite of the Board's failed and costly decision to put                    above Brian after my departure- a decision I adamantly opposed while I was still CEO. This is all a credit to Brian's leadership and his highly motivated and capable management team. I welcome an honest debate about what has happened with the other acquisitions that the Board and I made during my CEO tenure and the incoherent attempts at integration that went on after my departure.

5

Somehow in Jim's letter, there is an allusion that I caused the BK problems that currently exist or that there was some kind of unspecified improper behavior going on. It is unconscionable to attempt McCarthy tactics as a means of covering up his unmitigated failure. Specifically as it relates to conflicts of interest, once again Jim shamelessly pushes the preferred's agenda in this correspondence. "I know what Peter's (Ackerman) plan is and I'm sure it is the best solution". Do you care to share what this plan is with the Board? Does it entail handing over control of the Company to him with no payment of a premium? "The EMAK board absolutely must give Peter what he deserves, in order to have something for the rest of us. We must convert, or support a rights offering, or restructure the preferred. We absolutely cannot survive without Peter on our side." Peter will be "on our side" if the Company had reasonable value, like I left it. Doing bad deals to get him "on our side" is destructive and illegal and the common stockholders will not permit it. Peter is not entitled to anything more than anyone else. What we must absolutely do is fulfill our duties to our common stockholders and give them what they deserve. Perhaps it goes without saying that we had better not even think about employing some legal slight of hand and not seek shareholder approval for any deal with the preferred.

Another conflict exists with Jeff Deutschman, the designated preferred Director. On a phone call with me on April 21, 2009, he stated words to the effect of 'the preferred has control of the Company and we will determine what to do next. We are not interested in the common stockholders'. This is a blatant violation of his fiduciary role as a Director. It seems that he may have convinced other Board members (certainly Holbrook) that this is the case, when it is factually inaccurate. Peter Ackerman's recent comment to me that 'I let you back on the Board' certainly supports this view of control. I wasn't aware that Peter controlled the Board and decided who the common stockholder Directors are.

Finally, I note an interesting comment Jeff made to me on April 6, 2009 in New York City. He stated words to the effect that 2008's enormous, improper and horrendously dilutive stock grants (actual restricted shares with voting rights) were supposed to be stock options (which, of course, carry no voting rights and are worthless unless the stock rises). How can this be that a Director thinks he is approving options when actually restricted stock is granted? Jeff also noted at that meeting that Jim had failed to turn around the Products business and he put his faith in Peter Boutros and it failed- 'no excuses'. He also lamented that the Company's overhead was killing it.

- **Preferred stock.** I have touched on some of the dynamics of the preferred stock issues above, but a few additional points are worth highlighting. The preferred signed a heavily negotiated document in 2000 which specified various rights, preferences, dividends and conversion price. The preferred chose to renegotiate this instrument in 2006 (after my departure as CEO), eliminating the dividend and lowering the conversion price to $9/share from $14.75/share. Peter Ackerman is

6

one of the country's most sophisticated investors, so it is reasonable to assume he knew what he was signing. Fundamental to this negotiated security is the preferred has no "put" rights to get his money unless there is a change in control. To somehow change his deal now when the Company's value is so low is fundamentally detrimental to the common stockholders and is not justified, given, as of now, the Company has plenty of cash protecting his investment. A reasonable deal like we proposed to him in August (pre my awareness of the full BK risk), where all stakeholders are left with reasonable assets and the ability to make money, is fine and I fully support it. However, being hysterical like Jim and acting like we must change the preferred's deal at any cost is unacceptable. As I fear we will all soon find out, the Board's largest legal risk by far is with the common stockholders, not the preferred.

I have been telling Peter for four years that the Company was headed downhill; his preferred may ultimately be at risk, he would have absolutely no chance for appreciation and he would have great difficulty getting liquidity. I offered to work with him in any reasonable way. I had private equity backers that would have come in over the years and made him whole (or even provide a modest premium) if they had unfettered and quick access to Company information. He chose to ignore these warnings. Presumably, he also was fully supportive of my termination as CEO four plus years ago. (Once I eliminated Jeff's generous M&A deal and asked him to vacate the office I naively let him use full time, after management's continual complaints about his meddling, Jeff was not very supportive of me, to say the least. That appears to continue to be the case today.) For context, when I exited the Company, the preferred was consistently getting its 6% dividend and at $10.50 per share, the stock was within striking distance of its conversion target. The $15/share private equity indication I presented to the Board in April 2005, which was met with disdain and my termination, would have paid him out and a couple of million dollar premium to boot. (Jeff was likely against this bid because he wouldn't get paid well from Peter unless the price was at least in the upper teens.) Suffice it to say that Peter has had his liquidity chances in the past and he has made some bad decisions with this investment, including forfeiting the dividend and supporting a failed CEO. I am personally not going to give up 15 years of hard work building the Company to see all the worth dissipate for the common stockholders in order to bail out the preferred. The preferred simply has no right to this. And common stockholders will not allow themselves to get massively diluted and give up voting control of the Company in order to somehow satisfy the preferred. Never going to happen.

- **Common Stockholders.** Why the Board would not welcome the opportunity to have a special stockholders meeting escapes me. Common stockholders have never had a choice of Directors. The reason that a competing slate wasn't presented at the 2009 annual meeting was that I was working with the Board in good faith on a buyout during the proxy notice period. As to the members of Take Back EMAK, LLC (of which I am not one—yet), you need to ask them why they didn't run a slate then because I was not able to participate given my

7

potential buyer status at that time, but presumably it was because they wrongfully assumed the Board was really working in good faith toward a transaction.

In its infinite wisdom, the Board has determined that spending large sums of time and money groping for a way to satisfy the preferred stockholders demands, which have no legal basis, and not conduct the most fundamental act of democracy and give common stockholders a choice in who represents them, is a wise move. (It is worth noting that the cost of a special election would be low, as no proxy documents need to be filed with the SEC, given the Company's deregistered status. It is indeed ironic that we are choosing not to take advantage of one of the few actual benefits of being deregistered, given that we are being forced to bear the many burdens.) Well, allow me to let you in on a secret: it is virtually guaranteed that the current common Directors will be removed in a special election. Doesn't it bother you that you are serving stockholders who want you out, who believe you are doing a terrible job and are blindly supporting a failed CEO? Do you want to try to hang on until the next annual election and continue to fight a war with both the common and preferred stockholders while fighting for survival with our largest client? Do you want to have serious risk of losing your personal assets in the increasingly inevitable litigation? Your answer is evidently a resounding yes.

- **Financial Outlook.** I was certainly pleased to finally see a good quarter from the Company after years of losses and excuses. In particular, I think our Finance team, led by                and              , have done an outstanding job managing the Company's cash. (Unfortunately a shrinking company tends to yield good cash flow. Of course this phenomenon eventually ends.) However, as I look deeper into the numbers, it is clear that the strong second quarter is likely not repeatable. There was an almost 600 basis point improvement in gross margin over the first quarter that is not sustainable, certainly as it relates to the Products business the way it is currently positioned as largely a manufacturing vendor. The Company only forecasts another million dollars in EBITDA for the remaining five months of this year- traditionally among the strongest earnings periods. (On a net income basis, there is virtually no more profit projected for the year.) The Company's out-performance in 2009 is entirely attributable to the Products business ($    million above EBITDA plan, while the Services business is forecasted to be $      / below EBITDA plan) and is a result of great leadership from              and               The Products business is projected to account for 65% of EBITDA contribution for this year. Without Burger King going forward, forget it.

On the surface, the Products business majority profit contribution is fine and consistent with the Company's history. But as we look at the highly uncertain Burger King outlook, the non-sustainable margin improvement and the "pitch and win" nature of the Logistix business, it is clear that next year is going to be an enormous challenge to be profitable. Our long-shot solution to "saving" BK is to essentially wipe out our profit margin. Given the lack of scalability in the

8

Services business, unless Upshot and Neighbor deliver extraordinary growth, the Company will continue to shrink. The result will be more restructuring, more severance costs and more turmoil. The Company simply cannot cut its way to greatness.

I find it deeply disturbing that the core Products business has been left to languish. What has our CEO done to reinvent the business, to re-capture the higher margin creative and service elements? This business is a great platform and has distinctive strengths. It is a natural tie-in to intellectual property and the Hollywood community. It does need to be reinvented (as does elements of the Upshot business, which finds itself in constant price wars), regardless of what happens with BK. What has Jim done to lead this reinvention? I submit that living in St. Louis, visiting LA once a month, and not connecting with the employees and immersing himself in the business' unique history, competitive strengths and industry dynamics, is not the formula for reinvention. At this rate, there will be no need for the often discussed decentralization plan, as there will only be one business- Services. And the Board stands idly by and watches, while laughably and sadly, Jim touts that he can "speak more intelligently as to the future and our competitive set than anyone in the Company (regarding the Products business)" and "fixing this disaster is one of my greatest career accomplishments to date". I wish it were true, but the fact is he has had nothing to do with the business' recent success and has deeply imperiled its future by his negative BK Marketing relationship and lack of strategic leadership.

- **Last Overtures.** In my capacity as a common stockholder (and not as a Board member), I made a proposal to Peter Ackerman on September 8 in an attempt to break the impasse. As I told Stephen, it was to convert the preferred to a note. This proposal in its entirety was fair to the common holders and I believe would receive their support. It was also directly responsive to Peter's priorities, as he expressed them to me in a phone conversation the day before, and provided him a direct path to get paid his liquidation preference in full and earn interest in the interim. I have not heard back from him since it was sent.

In addition, after the September 9 Board meeting, after my resolutions to call a special meeting of the stockholders and to terminate the CEO were unanimously voted down, I made yet another attempt to find an acceptable resolution. In summary, this called for an exchange of my and certain other stockholders equity stake in return for certain assets of the Products business. The specific exchange rate was to be negotiated and the earn out amount would be ultimately contingent on what happens with BK. The key was getting a deal done immediately, so that I could lead a process to try and retain the BK business, through working with                    and our China factories. I believed this would allow the best chance to save the business and provide value to all stakeholders, including the preferred, common and employees. The resulting EMAK would be a pure Services business largely owned by the preferred, and allow the movement of its headquarters to Chicago, eliminating a large amount of

9

overhead. We could get a binding term sheet done within 48 hours if all parties were motivated.

It was a simplified version of the split-up deal we were working on for months. The reality is, the Products business may be worthless soon to EMAK, and it certainly isn't a strategic priority, so this solution seemed compelling. (I believe I can use the Products business as a platform for growth in other areas and thus it has strategic value to me) I spoke with Howard Bland about it, and he felt it was a good idea as well. I placed calls to Stephen Robeck and Jordan Rednor and left messages for them to call me (they did so later in the day). At that point, given time was of the essence, I decided to call Jim to talk with him about it. As you can imagine, reaching out to Jim wasn't easy, as it is safe to say that we have some fundamentally different views. But he is a Board member and the CEO and would certainly have a say in my proposed plan. The response from Jim was a threat to sue me for suggesting he should be removed "for cause" (he should). His thoughts on my idea were lukewarm at best. He said in essence, 'send us a proposal and we will look at it…. And Stephen is gone for 10 days and nothing will happen in the interim'. Perhaps naively, I expected Jim to embrace this idea and would want to get the wheels in motion ASAP to negotiate a deal, as it would solve multiple problems at once and was fully in the spirit of a deal the preferred stockholder had been pushing for (though the valuation was subject to BK renewal). Somehow I still believe that officers and directors first thoughts should be for the Company, regardless of personal issues. Clearly I was wrong.

Unfortunately Jim only seems concerned about his own position. Indeed, he even threatened me, stating in essence, 'if you ever propose to fire me "for cause" again, I will sue you'. That's quite a statement to a Board member and largest common stockholder, who has a fiduciary obligation to do what is in the best interests of stockholders. I continue to believe a "for cause" termination is warranted for reasons such as blatant neglect of our largest client, lying to the Board and lying to common stockholders, among other reasons. I am sorry if I hurt his feelings, but we all have a duty to propose motions that we think are appropriate and best for the Company, and I don't appreciate getting threatened for making a motion. As the conversation ended I hung up the phone concluding I am done trying to work with this Board on proposing solutions, a Board who blindly backs a failed CEO in the face of overwhelming evidence of what is at best disastrous performance and at worst complete failure to perform any duties at all. (I, of course, intend to continue to faithfully and diligently perform my job as an independent Director.)

As I stated in my April 13 letter, I intend to recover significant value for my 15 years of hard work building EMAK. I am quite sure the common stockholders would also like to recover their value. Unfortunately I now believe it will have to be through the judicial system which I have full confidence will deliver justice and appropriate compensation. I have worked diligently for over four years, tried every possible route over the last four months and pulled out all the stops in the last four days, but the Board's response is to

10

simply ignore reality and do nothing. I have given the Board and CEO every chance to improve performance and the result is a deregistered, illiquid Company whose stock is down over 90% from where I left it- and this is before the pending return to declining profitability and potentially devastating BK news. The Board's absolute priority has become working out a deal with the preferred stockholder, led by our conflicted CEO, regardless of its impact on other stakeholders. Our immediate priority should be on saving Burger King, then addressing the underlying problems that caused it to be in peril, as well as reaching out to re-establish a positive relationship with our common stockholders.

Your insistence on doing nothing, not taking responsibility, casting blame externally (primarily on me) and blindly supporting the CEO whose ex-superior at IPG told me three years ago is "not smart; a bad person who was not liked by his peers or employees; was going to be fired by IPG and was astonished BMAK hired him", and who current and ex-BMAK employees have no professional or personal respect for, is both mind-boggling and a blatant disregard for our collective obligations to the Company and its shareholders. Jim even reportedly told employees words to the effect that 'I think they hired the wrong CEO, but I have a two year severance deal so I am not worried'.

You will now finally be held to account.

Sincerely,

Donald A. Kurz

11

1

## PROOF OF SERVICE

2  1.  At the time of service I was over 18 years of age and not a party to this action.  My business address is: Spillane Weingarten LLP, 1100 Glendon Avenue, Suite 1200, Los Angeles, California 90024.

3

4  2.  On July 29, 2010 I served the following document(s):

**SECOND AMENDED DERIVATIVE COMPLAINT**

5

6  3.  I served these documents on the following person(s):

**SEE ATTACHED LIST**

7

8  4.  The document(s) in item 2 were served by the following means:

**x  By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 3 and *(specify one)*:

9

10  ☐  (1) deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

11  **x**  (2) placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

12

13

14  ☐  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 3. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

·15

16  ☐  **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 3. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

17

18  ☐  **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in item 3. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

19

20  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

21

22  Amy L. Flescher

23

24

25

26

27

28

## SERVICE LIST

| | |
|---|---|
| Thad A. Davis, Esq.<br>Michael Li-Ming Wong, Esq.<br>Sarah Zenewicz, Esq.<br>Ropes & Gray LLP<br>Three Embarcadero Center, 3rd Floor<br>San Francisco, CA 94111-4006 | *Attorneys for Defendants:*<br>*Stephen P. Robeck, James Holbrook,*<br>*Jordan H. Rednor, Howard D. Bland,*<br>*Debra Fine, Daniel O'Connor,*<br>*Alfred Osborne, Jr., and Barrie Berg* |
| Charles W. Cox, Esq.<br>Russell F. Sauer, Esq.<br>Latham & Watkins LLP<br>355 South Grand Avenue<br>Los Angeles CA 90071-1560 | *Attorneys for Nominal Defendant:*<br>*EMAK Worldwide, Inc.* |
| Peter Ackerman<br>3229 R. Street NW<br>Washington D.C. 2007<br><br>Crown EMAK Partners, LLC<br>c/o Peter Ackerman<br>3229 R. Street NW<br>Washington D.C. 2007 | *Defendants* |
| **Courtesy Copy:**<br><br>Jeremy W. Stamelman, Esq.<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197 | *Attorney for Crown EMAK Partners, LLC &*<br>*Peter Ackerman* |

2

PROOF OF SERVICE

1

## PROOF OF SERVICE

2 1.  At the time of service I was over 18 years of age and not a party to this action.  My business address is:
Spillane Weingarten LLP, 1100 Glendon Avenue, Suite 1200, Los Angeles, California 90024.

3

4 2.  On September 15, 2010, I served the following document(s):

5 **NOTICE OF REMOVAL OF ACTION TO UNITED STATES BANKRUPTCY COURT**

6 3.  I served these documents on the following person(s):

7 **SEE ATTACHED LIST**

8 4.  The document(s) in item 2 were served by the following means:

9 **x  By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the
persons at the addresses in item 3 and *(specify one):*

10 ☐  (1) deposited the sealed envelope with the United States Postal Service, with the postage fully
prepaid.

11 **x**  (2) placed the envelope for collection and mailing, following our ordinary business practices. I am
readily familiar with this business's practice for collecting and processing correspondence for mailing.

12 On the same day that correspondence is placed for collection and mailing, it is deposited in the
ordinary course of business with the United States Postal Service, in a sealed envelope with postage
fully prepaid.

13

14 ☐  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight
delivery carrier and addressed to the persons at the addresses in item 3. I placed the envelope or package for

15 collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

16 ☐  **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed
the documents to the persons at the fax numbers listed in item 3. No error was reported by the fax machine

17 that I used. A copy of the record of the fax transmission, which I printed out, is attached.

18 ☐  **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept
service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail

19 addresses listed in item 3. I did not receive, within a reasonable time after the transmission, any electronic
message or other indication that the transmission was unsuccessful.

20 I declare under penalty of perjury under the laws of the State of California that the foregoing is true and
correct.

21

22 Amy L. Fleschel

23

24

25

26

27

28

1

## SERVICE LIST

2

| | |
|---|---|
| Thad A. Davis, Esq.<br>Michael Li-Ming Wong, Esq.<br>Sarah Zenewicz, Esq.<br>Ropes & Gray LLP<br>Three Embarcadero Center, 3rd Floor<br>San Francisco, CA 94111-4006 | *Attorneys for Defendants:*<br>*Stephen P. Robeck, James Holbrook,*<br>*Jordan H. Rednor, Howard D. Bland,*<br>*Debra Fine, Daniel O'Connor,*<br>*Alfred Osborne, Jr., and Barrie Berg* |
| Charles W. Cox, Esq.<br>Russell F. Sauer, Esq.<br>Latham & Watkins LLP<br>355 South Grand Avenue<br>Los Angeles CA 90071-1560 | *State Court Attorneys for Nominal*<br>*Defendant: EMAK Worldwide, Inc.* |
| Jeremy W. Stamelman, Esq.<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA  90071-3197 | *Attorneys for Crown EMAK Partners, LLC &*<br>*Peter Ackerman* |
| Office of the United States Trustee<br>725 S. Figueroa Street, Suite 2600<br>Los Angeles, CA 90017 | *United States Trustee* |
| Jeffrey M. Reisner, Esq.<br>Irell & Manella LLP<br>840 Newport Center Drive, Suite 400<br>Newport Beach, CA 92660--6324 | *Bankruptcy Counsel for Debtor:*<br>*EMAK Worldwide, Inc.* |
| David L. Neale, Esq.<br>Levene, Neale, Bender, Yoo & Brill L.L.P.<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, California 90067 | *[Proposed] Counsel for Official Committee of*<br>*Unsecured Creditors* |

2